**Trayon REDD, Appellant,**

v.

**Lawrence H. SUMMERS, Secretary of the United States Treasury, Appellee.**

**No. 99–5329.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 26, 2000.

Decided Dec. 1, 2000.

---

Leizer Z. Goldsmith argued the cause and filed the briefs for appellant. Karen A. Bower entered an appearance.

Blane A. Workie, Special Assistant United States Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: WILLIAMS, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Treasury Department's Bureau of Engraving and Printing retained Aspen Personnel Services, Inc., to provide tour services at the Bureau. In July 1995 Aspen hired Trayon Redd as a tour guide. In March 1996 Aspen removed Redd from her job at the Bureau. When Redd complained to Aspen about her dismissal, Aspen rehired Redd and attempted to reinstate her at the Bureau. The Bureau refused.

■ Redd, who is 5'7" tall and weighs about 348 pounds, perceived the Bureau's behavior in these affairs as a response to her weight. (So far as appears, Redd's weight did not change between her hiring in 1995 and her dismissal in 1996.) She has brought claims against the Bureau under §§ 501 and 504 of the Rehabilitation Act of 1973 ("RHA"). Section 501 provides for interagency coordination relating to federal employment of persons with disabilities, and although it does not explicitly either prohibit federal government disability discrimination in employment, or authorize prohibitory regulations, it is understood to support the Equal Opportunity Employment Commission's adoption of regulations that do so. 29 U.S.C. § 791; see 29 C.F.R. § 1614.203(b). These regulations alone established the law on disability discrimination in federal government employment until an RHA amendment in 1978 allowed private litigants to enforce rights under § 501 in suits employing the "remedies, procedures, and rights set forth in" the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16. 29 U.S.C. § 794a(a)(1). In 1992 Congress again amended the RHA to provide that the standards used to judge "nonaffirmative action employment discrimination" under § 501 "shall be the standards applied under" the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 et seq. and §§ 12201–12204 and 12210. 29 U.S.C. § 791(g). See generally *Barth v. Gelb*, 2 F.3d 1180, 1183–84 (D.C.Cir.1993). Section 504 of the RHA addresses federal disability discrimination in a different sphere—the administration of a federal program or activity. 29 U.S.C. § 794(a). Redd brought claims against the Bureau under both provisions, claiming for purposes of § 501 that it was in truth her employer. Her claims against Aspen under the D.C. Human Rights Act are not before us, as she has not appealed the district court's grant of summary judgment on those claims.

The Bureau sought and the district court granted summary judgment on all counts. Because Redd was never an employee of the Bureau, we affirm the district court's grant of summary judgment on Redd's § 501 claims. As to the § 504 claims, we reverse and remand the case, as the district court's rejection of Redd's claims was based on a misunderstanding of the relation between §§ 501 and 504.

\* \* \*

Under the contract between Aspen and the Bureau, Aspen was responsible for training all tour guides, paying guides' wages and providing benefits, including annual leave. Aspen and the Bureau each had a representative to handle their relationship—in the Bureau's case a liaison officer, the Contracting Officer's Technical Representative, and in Aspen's an on-site supervisor for its workers, the Lead Tour Guide. The Technical Representative and her supervisor at the Bureau had the right

to reject any tour guide, but Aspen did all the hiring and firing. The Bureau appointed Antoinette Banks as Technical Representative, and Aspen appointed Henrietta Walls as the Lead Tour Guide.

Redd's complaint against the Bureau stems from five episodes involving Banks and Redd between June 1995 and March 1996. First, Redd alleges that on the occasion of her hiring Banks told Redd and her mother that the tour guide job required a lot of walking in the sun, drinking water and limiting one's consumption of milk. Redd regards these remarks as obesity-based aspersions on her ability to guide tours. Second, Redd finds another obesity-based aspersion in Banks's remark to Redd's mother, in December 1995, that with all the walking the tour work required Redd would surely lose some weight.

Third, Redd says that on March 12, 1996, Banks and Walls said that Redd's tour "spiel" was deficient and temporarily suspended her from guiding tours. In the next few days Walls and Banks tested the guides on their spiels and criticized Redd for her pronunciation; on March 20, Banks accompanied Redd on a tour and evaluated her performance. Redd evidently sees the scrutiny as derived from Banks's perception of her obesity.

Fourth, Redd alleges that in a phone conversation on March 21, 1996, Redd's mother asked Banks if the latter's concerns with Redd's performance were related to Banks's comments in June 1995 (referring to walking in the sun, and drinking water but not much milk, which Redd perceived as relating to obesity). In the phone call Redd's mother told Banks that "full-figured" women are not unable to perform the job of a tour guide. Redd alleges that later that day, after a conversation with Banks, Walls told Redd that her evaluation was sub-standard and that she would be terminated. Redd's view is that Banks's opposition was behind the termination, and was driven by obesity concerns and/or a desire to retaliate for Redd's mother's "full-figured" remarks.

Finally, Redd wrote to Aspen on April 12, 1996, complaining at length about what she saw as her mistreatment by Aspen and the Bureau. Aspen rehired her on June 3, 1996, but the Bureau refused to allow her reinstatement as a Bureau guide. Redd alleges that Banks's superior, Teresa Brooks, who had the authority to reject Redd, made her decision solely on the advice of Banks. Again, Redd infers that Banks's alleged advice was obesity motivated and retaliatory (both for the mother's remarks about "full-figured" women and for the protests in the April 12 letter).

Aspen suggested that Redd fill out applications for jobs on other Aspen contracts, but she didn't do so and was terminated by Aspen in July 1996.

\* \* \*

The parties agree that § 501 applies only to disability discrimination in federal government employment, while § 504 addresses discrimination in "any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). As Redd was undoubtedly an employee of Aspen, she seeks to bring herself within § 501 on the theory that Treasury and Aspen are her joint employers. She argues—and Treasury accepts—that we should apply the test stated in *Spirides v. Reinhardt*, 613 F.2d 826 (D.C.Cir.1979), a case considering whether the plaintiff was an employee or an independent contractor.

Despite the parties' agreement, we doubt whether the *Spirides* test is suited to this case. Where the plaintiff is herself either an employee of only one employer or an independent contractor, see *id.* at 827, classification as the latter leaves her with no protection against employment discrimination. But Redd, even if not an employee of the Bureau, clearly enjoyed protection against employment discrimination by Aspen, which was indisputably her employer. Here, of course, Redd's claims against Aspen lost, in part on statute of limitations grounds, in part on the merits. But her classification as Aspen's employee leaves no suggestion of a gap in the con-

gressionally intended protection against employment discrimination.

This court has never invoked *Spirides* to resolve an issue of joint employment, although the Fifth Circuit has done so, see *Fields v. Hallsville Independent School District*, 906 F.2d 1017, 1019–20 (5th Cir. 1990). For a joint employment test, a fairly standard formulation is that of the Third Circuit, namely, whether "one employer[,] while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *NLRB v. Browning–Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117, 1123 (3d Cir.1982). Because the parties have not argued the issue we will not try to resolve which test is applicable or indeed whether there is a material difference between the two, but simply note the possibility of arguments on the point.

■■■ Accepting the parties' assumptions arguendo, we proceed to apply *Spirides*. The decision identifies one criterion—the putative employer's "right to control the 'means and manner' of the worker's performance"—as central to classification as an employee or independent contractor. 613 F.2d at 831. Elaborating, it observes that if the putative employer has "the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id.* at 831–32. It then proceeds to list eleven "[a]dditional matters of fact" that may be relevant. *Id.* at 832. While the eleven factors should ideally be used to address the question of control—with both control and the eleven factors being evaluated simultaneously—we consider the two in succession.

We take the control test first. In the nine months Redd worked at the Bureau, there was only one short period in which Banks involved herself in the "means and manner" of Redd's work—her tour presentation. That involvement occurred just nine days before Redd's termination. On March 12, 1996, Banks and Walls met with Redd, told her that her performance was defective, and removed her from her duties. Between March 12 and March 20, Banks actively helped Redd improve her tour presentation over the course of five or six meetings. Walls participated in all but two of these—on March 14, when Banks, while escorting Redd to the tour post, reiterated that the latter should memorize her spiel, and on March 20, when Banks accompanied Redd on an evaluation tour. But both Banks and Walls made the decision to allow Redd to do such a trial run. Further, though Walls was not physically present during Redd's tour, Walls said in her deposition that she listened to Redd's performance from the listening booth. Banks's brief and chaperoned intervention into Redd's routine does not qualify as "control[ling] the 'means and manner' " of her performance.

Moreover, we note a difference between work involving a performance directed to the putative employer's customers, and work involving production of a tangible object. In the latter case, obviously, a party can exercise control over the "result" without ever laying eyes on the worker; here, by contrast, control over the "result," the guides' tour presentations, requires some review of the guides as they give their spiels. In this context it is telling that Banks did not get involved in Redd's initial training, the work that produced the finished product—the performances themselves. Banks's interventions, well into Redd's tenure, amount to little more than an inspection of the quality of Aspen's services.

None of the other interactions between Banks and Redd amounts to controlling the "means and manner" of Redd's routine. Banks's comments to Redd and Redd's mother in June and December 1995, evidently understood by Redd as relating to her weight, and Banks's conversa-

tion with Redd's mother in March 1996, are not assertions of control over Redd. At most they bear on the question of discrimination—not control.

■ *Spirides*'s eleven "additional" factors do not alter our conclusion:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.,* by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

613 F.2d at 832.

■ Rather than simply plow through the eleven factors, we think it more useful to collect them in groups of items that seem to perform similar functions in getting to a sound result. We find four such groups. The first we see as comprised of a single factor: (11) the intent of the parties, primarily as reflected in the contract between the "contractor" and its "client" (here the Bureau). As the *Spirides* court noted, of course, the intent of the parties alone cannot "waive protections granted to an individual under ... any act of Congress." 613 F.2d at 832. Thus, intent to make the individual an employee of the client is more likely to prove the relationship than the opposite intent is to disprove it. Here the contract explicitly states that the contractor's personnel "shall not at any time during the contract period be employees of the U.S. Government." Aspen Contract, § H.9(c).

■ The second group of factors can be seen as addressing whether contracting out work is justifiable as a prudent business decision: (1) whether supervision of the contractor by the client is required; (2) whether the contractor's work does not require special skills; and (8) whether the work performed by the contractor is an integral part of the client's business. An affirmative answer to these questions may call into question the business bona fides of the decision to hire an independent contractor, possibly suggesting a purpose to circumvent rights afforded to employees.

Here, Redd's work required supervision, but Aspen provided it via the Lead Tour Guide, Walls. While Banks, the Bureau's Technical Representative, evaluated Redd twice, Aspen was responsible for all training. Banks appears not to have supervised Redd before March 12, 1996, and even after that date, Walls accompanied Banks on all occasions but two: a brief encounter on March 14, 1996, and the evaluation tour of March 20, 1996. As Walls and Banks were equals—liaisons under the terms of the contract—Walls was by no means Banks's messenger. Finally, the Bureau is a printer of currency and stamps; tours are part of its public relations, not an integral part of its business. There is nothing to suggest that the Bureau's decision to contract out tours was a sham.

■ If hiring independent contractors cannot be dismissed as an implausible business decision, it is sensible to turn to a third group of factors, which seem to renew the question of the client's control over the work (which, we recall, is in a sense the ultimate determinant): (3) whether the client furnishes the equipment used and place of work; and (6) the manner in which the work relationship was terminated. Here the inquiry is whether the business is exercising a degree of control that seems excessive in comparison to a reasonable client-contractor relationship in the same circumstances.

The evidence on these matters does little to prove Redd an employee of the

Bureau. Of course the Bureau provided office space and the tour guides worked at the Bureau, but in context this proves little. That a landscaper's employees worked at the site of a landscaping job would hardly support an inference that they were the client's employees; the nature of the work compels the site. It is true that the Bureau also provided tour guides with office supplies, two-way radios and uniforms. But the Bureau presumably would want continuity in uniforms regardless of who held the tour guide contract, while Aspen's interest was contract dependent. The office supplies and radios seem de minimis.

As to Redd's termination, while the contract gives the Bureau the right to reject any guide, under the contract the decision to terminate the guide's employment with Aspen is solely within Aspen's power. To pursue the landscape example: the client's command to remove a specific worker (say, on grounds of rudeness or just personal incompatibility) would hardly render the worker an employee of the client. Here, in fact, the link of the Bureau to Redd's termination with Aspen was especially tenuous: Aspen asked her to file another employment application in July 1996 and Redd did not.

■ The final group of factors appears to ask whether the relationship shares attributes commonly found in arrangements with independent contractors or with employees: (4) the duration of the engagement; (5) the method of payment; (7) whether annual leave is afforded; (9) whether the worker accumulates retirement benefits; and (10) whether the client pays social security taxes. Employment relationships tend to be longer or at any rate more likely of indefinite length, to afford annual leave and retirement payments, and to assign payment of social security taxes to the employer. Payment by time period suggests employment; payment by product suggests an independent contractor relation. Here, of course, the *Spirides* factors' misfit with the issue is most acute: Redd indisputably *was* the

employee of Aspen. It paid Redd's wages, provided for her vacation time, and paid the social security taxes due. Her employment appears to have been at will. Nothing here suggests Redd was the Bureau's employee.

Cases applying *Spirides*'s multi-factor test add little guidance. The only case Redd cites where the government was deemed an employer of a government contractor's worker for purposes of Title VII is an EEOC decision, *Oliver v. Albright*, 1998 WL 611868, 1998 EEOPUB LEXIS 4962 (EEOC Aug. 31, 1998). But in that case (which of course is not binding) the employment relation and the job, Resident Manager of the U.S. Embassy in Moscow, were under direct control by the State Department, which provided not just workplace but housing, sick leave, medical benefits, and training.

We conclude that an application of the *Spirides* test, however ill-suited to an analysis of whether an employee of a independent contractor is also an employee of the contractor's client, suggests that Redd is not an employee of the Bureau.

■ Earlier we oversimplified a bit in saying that Redd could prevail under § 501 only by proving herself the employee of the Bureau. Redd invokes a case under Title VII, *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973), for the idea that there may be liability for certain nonemployer parties, such as unions and employment agencies, who stand between a worker and some potential employers. Although the case relied explicitly on the language of Title VII, see *id.* at 1340–42, the Bureau seems to accept its applicability under § 501; accordingly we proceed on that assumption.

In *Sibley* a male nurse claimed that a hospital had refused to refer him to female patients and on occasion prevented him from reporting to female patients who had requested a nurse. *Id.* at 1339–40. The court held that even though the hospital did not directly employ the male nurse, it could be liable for employment discrimina-

tion because it had used its control of access to potential employers to deny him significant employment opportunities. *Id.* at 1342.

But the *Sibley* structure is absent here. In screening guides supplied by Aspen, the Bureau was simply a consumer of Aspen's services, not an intermediary between would-be guides and services that might employ them. Redd's proposed extension of *Sibley* would produce a result Congress certainly did not intend—consumers would be liable under civil rights laws for their race, gender, age and disability-based preferences. The *Sibley* decision would be on point if the court had found a female patient liable for rejecting the services of a male nurse, but it plainly did not.

We therefore affirm the district court's grant of summary judgment for Treasury on all § 501 claims.

\* \* \*

 The district court also granted summary judgment on Redd's § 504 claim, reasoning that Redd had "identified no evidence that would suggest that the [Bureau] utilized discriminatory administrative methods separate and distinct from its allegedly discriminatory employment practices." The court cited our decision in *Barth v. Gelb,* 2 F.3d 1180, 1183 (D.C.Cir.

1993), and summarized it as suggesting that § 501 "is the appropriate vehicle for employment discrimination claims." That is indeed its suggestion, but the issue before the district court here was whether, § 501 having been shown to be inapplicable, Redd's § 504 claims had any merit. That the Bureau was not her employer, as the court had correctly found, sheds no light on that question. The Bureau's tour guide contract may constitute a federal program or activity, in which case Redd is entitled to show that she was unlawfully denied participation in the contract or retaliated against for protesting such denial. 29 U.S.C. § 794(a); 31 C.F.R. § 17.140. Accordingly, the court's grounds for grant of summary judgment as to § 504 were unsound.

\* \* \*

We affirm the grant of summary judgment on Redd's § 501 claims; we reverse the grant of summary judgment on § 504 and remand the case for further proceedings.

*So ordered.*