# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 11, 2016          Decided July 1, 2016

No. 15-5025

MOHAMED TAWHID AL-SAFFY,
APPELLANT

v.

THOMAS J. VILSACK, IN HIS OFFICIAL CAPACITY AS SECRETARY,
U.S. DEPT. OF AGRICULTURE AND JOHN F. KERRY, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF STATE,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01562)

*Susan Laiken Kruger* argued the cause for appellant. On the briefs was *Alan Lescht*.

*Damon W. Taaffe*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Vincent H. Cohen Jr.*, Acting U.S. Attorney at the time the brief was filed, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: TATEL and MILLETT, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:   Mohamed Tawid Al-Saffy filed complaints with both the Department of Agriculture and the Department of State alleging employment discrimination on the basis of religion and national origin, and retaliation for asserting those discrimination claims.   Dissatisfied with the agencies' processes, he filed suit under Title VII, 42 U.S.C. § 2000e *et seq*.   Determining whether Al-Saffy's lawsuit was properly brought requires us to navigate a quagmire of procedural rules.   Fortunately for Al-Saffy, his claims emerge intact (at least for summary judgment purposes), and the district court's order of dismissal must be reversed.

**I**

**A**

Title VII broadly protects "employees or applicants for employment" from "discrimination based on race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-16(a). The statute's protections extend to employees of the federal government.   *Id.*

The Equal Employment Opportunity Commission has "broad authority to enforce [Title VII's] antidiscrimination mandate within the federal government."   *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).   To that end, the Commission has put into place "detailed procedures for the administrative resolution of discrimination complaints," including time limits for "seeking informal adjustment of complaints, filing formal charges, and appealing agency decisions to the Commission."   *Id.*

To begin with, a federal government employee who alleges unlawful discrimination must "initiate contact with a[n] [Equal Employment Opportunity] Counselor within 45 days"

of a discriminatory event.   29 C.F.R. § 1614.105(a)(1).[1]   The Counselor will attempt an informal resolution of the claim.   If informal counseling does not resolve the employee's claim, however, the employee may file a formal complaint with the employing agency itself, usually through that agency's Equal Employment Opportunity ("EEO") office.  *See generally id.* § 1614.106.   The agency then has 180 days from the filing of the complaint in which to conduct "an impartial and appropriate investigation of the complaint[.]"   *Id.* § 1614.106(e)(2).

Once the agency has completed the investigation and provided the employee with its investigative report, the employee has a variety of options.   For starters, if the employee requests an immediate decision from the agency, then "[t]he agency shall issue [a] final decision within 60 days of receiving" that request.   29 C.F.R. § 1614.110(b).   But if the employee fails to respond to the investigative report within thirty days, the agency must issue a final decision within sixty days of the end of that thirty-day window for the employee's response.  *Id.*   Either way, the agency decision "shall consist of findings by the agency on the merits of each issue in the complaint,  * * *  and, when discrimination is found, appropriate remedies and relief[.]"   *Id.*   In addition, the agency decision must "contain notice of the right to appeal the final action to the Equal Employment Opportunity Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for appeals and lawsuits."   *Id.*

As an alternative to those routes for obtaining a decision by the employing agency, the employee may instead request a

---

[1] Like the Title VII statute, the governing regulations apply to employees, former employees, and applicants for employment.  *See* 42 U.S.C. § 2000e-16; 29 C.F.R. § 1614.103(c).   For ease of reference, this opinion uses "employee" to cover all of those groups.

hearing by an Equal Employment Opportunity Commission administrative law judge ("ALJ") within thirty days of receiving the agency's investigative report. 29 C.F.R. §§ 1614.106(e)(2), 1614.109(a). The Commission will then "appoint an administrative judge to conduct a hearing," and that ALJ will "assume full responsibility for the adjudication of the complaint." *Id.* § 1614.109(a). After reviewing the administrative complaint, the ALJ may dismiss the "entire complaint," *id.* § 1614.107(a), or may determine whether a hearing is necessary to resolve the dispute, *id.* § 1614.109(g).[2] Ultimately, if the complaint is not dismissed, the ALJ "shall issue a decision on the complaint, and shall order appropriate remedies and relief where discrimination is found" within "180 days of receipt by the administrative judge of the complaint file from the agency." *Id.* § 1614.109(i).

Once the ALJ issues a decision, the agency must enter a final order within forty days. 29 C.F.R. § 1614.110(a). That final order "shall notify the complainant whether or not the agency will fully implement the decision of the administrative judge," and "shall contain notice of the complainant's right to appeal to the Equal Employment Opportunity Commission, the

---

[2] The regulations list nine grounds for dismissal of the "entire complaint": (1) failure to state a claim; (2) failure to comply with applicable time limits; (3) a pending or completed civil action in a United States District Court that shares the same basis as the complaint and to which the employee was a party; (4) the employee's pursuit of the matter in a negotiated grievance procedure, or in an appeal to the Merit Systems Protection Board; (5) the complaint is moot or challenges a preliminary step to taking a discriminatory action, unless the preliminary step is retaliatory; (6) the employee cannot be located; (7) failure to respond adequately to the agency's written request for relevant information, provided that the request included a notice of the proposed dismissal; (8) the complaint asserts dissatisfaction with the processing of a previously filed complaint; or (9) the complaint is part of a clear pattern of misuse of the EEO process. 29 C.F.R. § 1614.107(a)(1)–(9).

right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for appeals and lawsuits." *Id.* If the agency fails to issue such an order within forty days, the ALJ's decision "shall become the final action of the agency." *Id.* § 1614.109(i).

An employee may appeal any final agency action to the Equal Employment Opportunity Commission "within 30 days of receipt of the final decision of the agency." 29 C.F.R. §§ 1614.401(a), 1614.402(a). Alternatively, the employee may file suit in federal district court within ninety days of receiving the final agency action. 42 U.S.C. § 2000e-16(c) ("Within 90 days of receipt of notice of final action taken by a department, agency, or unit * * * an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action[.]"); 29 C.F.R. § 1614.407(a), (c).

Finally, if no final agency action is taken and no appeal to the Commission has been filed, the employee may file suit in federal district court any time "[a]fter 180 days from the date of filing" the administrative complaint with the employing agency. 29 C.F.R. § 1614.407(b).

**B**

Because the district court granted summary judgment in favor of the government, we take "the facts in the record and all reasonable inferences derived therefrom in a light most favorable to" Al-Saffy. *DeGraff v. District of Columbia*, 120 F.3d 298, 300 (D.C. Cir. 1997) (quoting *Wardlaw v. Pickett*, 1 F.3d 1297, 1299 (D.C. Cir. 1993)).

Al-Saffy is an Egyptian-American Muslim who has been employed by the Foreign Agricultural Service, a component of

the United States Department of Agriculture, since December 2001. In 2008, Al-Saffy was named the Director of the Saudi Arabia and Yemen Agricultural Trade Offices. Just before Al-Saffy was scheduled to depart for Saudi Arabia, Susan Schayes, the Assistant Deputy Administrator for the Office of Foreign Service Operations for the Agriculture Department, placed Al-Saffy's travel on hold. Al-Saffy filed an EEO complaint against the Agriculture Department, challenging that action and alleging discrimination based on religion and national origin, as well as retaliation. He later withdrew his complaint when Schayes permitted him to travel to Saudi Arabia to begin his assignment.

Al-Saffy alleges that, while he was abroad, he was harassed by Roland McKay, a State Department Economic/Commercial Officer in the United States Embassy in Yemen. Between October 2009 and August 2010, McKay allegedly obstructed Al-Saffy's management of his subordinates, purported to suspend Al-Saffy's visits to Yemen, interfered with the allocation of funds for which Al-Saffy was responsible, and communicated with Al-Saffy's supervisor about matters within Al-Saffy's purview.

Later, when Al-Saffy traveled back to Washington, D.C., to rest and recuperate, his supervisor—Kim Svec, Area Director of the Africa and Middle East Division—scheduled back-to-back meetings for him, contrary to the normal practice of including scheduled breaks. Also, when Svec traveled to the Middle East, she did not allow Al-Saffy to travel with her from Saudi Arabia to Yemen, although the normal practice is for a Trade Office Director to accompany an Area Director to other countries that they both cover.

Additionally, during a meeting in D.C., Schayes allegedly asked Al-Saffy if he was Muslim. After Al-Saffy returned to Saudi Arabia, Schayes repeatedly "yelled at him for no reason" during phone conversations. J.A. 11 (Compl. ¶ 29). When

James Higgiston replaced Schayes on August 17, 2010, he immediately informed Al-Saffy that he would no longer be the Trade Office Director in Yemen.

Based on those events, Al-Saffy contacted the Agriculture Department's EEO office on September 7, 2010. On March 4, 2011, Al-Saffy filed a formal EEO complaint against the Agriculture Department ("2011 Complaint"), alleging discrimination based on national origin and religion, and reprisal for exercising his rights against employment discrimination. Following the agency's investigation, Al-Saffy requested a hearing before an ALJ on his complaint.

Meanwhile, in August 2011, Al-Saffy filed a request for a one-year extension of his position as Director of the Saudi Arabia Trade Office. Though such extensions usually are routinely approved, Al-Saffy's was denied. Higgiston also modified the position so that Al-Saffy would no longer be eligible for it. Al-Saffy further alleges that Schayes, Svec, and Higgiston ensured that Al-Saffy received substandard housing in Saudi Arabia. Finally, in November 2011, Higgiston and Svec refused to allow Al-Saffy to attend a work-related conference in Atlanta.

Based on those events, Al-Saffy timely contacted the Agriculture Department's EEO office, and filed another formal EEO complaint against the Department on March 27, 2012 ("2012 Complaint"), also alleging discrimination on the basis of religion and national origin, and reprisal for his prior EEO activity.

After Al-Saffy returned to the United States in June 2012, he was assigned to a subordinate position as International Agriculture Development Specialist. J.A. 14 (Compl. ¶ 50). Al-Saffy later amended the 2012 Complaint to identify that assignment as an additional instance of discrimination. As he had with the 2011 Complaint, Al-Saffy requested an ALJ

hearing on the 2012 Complaint following the agency's investigation.

On March 29, 2013, Al-Saffy sent the Equal Employment Opportunity Commission two identical letters stating that he was "withdraw[ing] his request for a hearing" before the ALJs on his 2011 Complaint and his 2012 Complaint, and advising that he would instead be filing a complaint in federal court. J.A. 94, 96.

On April 3, 2013, the ALJ presiding over the 2012 Complaint issued an order stating:

> Notice is hereby given that the above captioned case is DISMISSED pursuant to the attached letter from Complainant's Attorney withdrawing his request for a hearing, indicating that he will be filing a complaint in federal district court.

J.A. 93.

On April 30, 2013, the ALJ presiding over the 2011 Complaint issued a differently worded order stating:

> Pursuant to the Complainant's attached Notice of Withdrawal dated March 29, 2013, the hearing request for the captioned matter is hereby DISMISSED. Absent notice that a civil action has been filed in this matter, the Agency shall issue a final decision in accordance with the procedures set forth at 29 C.F.R. § 1614.110(b) (2012).

J.A. 97. Neither order detailed Al-Saffy's appeal rights or provided any additional information about time limits for further review.

Meanwhile, on February 21, 2013, Al-Saffy received the Agriculture Department's administrative motion for summary judgment on the 2011 Complaint. Attached to that motion were affidavits of two State Department officials describing their roles in having Al-Saffy removed from his position as Director of the Yemen Trade Office. Angie Bryan, then the Deputy Chief of Mission in Yemen, stated that she expressed concerns about Al-Saffy to Svec and advocated for Al-Saffy's removal. Stephen Seche, then the United States Ambassador to Yemen, stated that he was concerned that Al-Saffy's interpersonal style was so disruptive as to necessitate his removal. Bryan's affidavit also showed that she and Seche relied on allegedly false information from Roland McKay in advocating for Al-Saffy's removal.

After receiving those affidavits, Al-Saffy contacted the State Department's EEO office on April 7, 2013. He later filed a formal EEO complaint against the State Department in July 2013, alleging discrimination based on race, national origin, and religion, and reprisal for prior EEO activity. On October 1, 2013, the State Department dismissed the complaint "in its entirety" for two reasons. J.A. 86. First, the State Department said the complaint was redundant of the 2011 Complaint against the Agriculture Department. Second, the State Department ruled that the complaint was untimely because Al-Saffy had failed to contact an EEO counselor within forty-five days of learning about the State Department's allegedly discriminatory participation in his removal as the Yemen Trade Office Director. The State Department reasoned that the Bryan and Seche affidavits were "[p]resumably" included in the Agriculture Department's investigative report on the 2011 Complaint, and on that basis "[a]ssum[ed]" that Al-Saffy was "aware of the affidavits" before February 21, 2013—which was more than forty-five days before he contacted an EEO counselor. J.A. 87.

## C

Al-Saffy subsequently filed suit in the United States District Court for the District of Columbia, alleging that the Agriculture and State Departments each discriminated against him based on religion and national origin, and retaliated against him for filing an EEO complaint, all in violation of Title VII. The government moved to dismiss the complaint as untimely, arguing that Al-Saffy failed to file suit within ninety days of final agency action on his 2011 and 2012 administrative complaints. The government also argued that the State Department was not a proper defendant and that, even if it were, Al-Saffy waited too long to contact the State Department's EEO office.

The district court granted summary judgment for the government. The court concluded that the Agriculture Department's inaction for the forty days following the ALJ orders dismissing Al-Saffy's 2011 and 2012 Complaints rendered those orders "final agency action" and triggered Title VII's ninety-day clocks—ending on July 29, 2013, and July 2, 2013, respectively—for Al-Saffy to file suit in federal court. J.A. 119. Because Al-Saffy did not file his court complaint until October 10, 2013, the court found the claims against the Agriculture Department to be untimely.

With respect to the State Department, the district court ruled that the Department was not a proper defendant because Al-Saffy never alleged that he was an employee or applicant for employment with the State Department. The court also held that, because Al-Saffy delayed more than forty-five days before contacting an EEO Counselor after learning of the State Department's allegedly discriminatory role in his removal from his Yemen position, the complaint was barred.

**II**

We review *de novo* the district court's grant of summary judgment, and can affirm only if there is no material error of law in the district court's analysis and there are no genuinely disputed issues of material fact. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). If, on the other hand, any material facts are at issue or, though undisputed, are susceptible to divergent inferences, summary judgment must be denied. *Id.*

**A**

The district court held that the ALJ order dismissing Al-Saffy's hearing request for his 2011 Complaint was the type of ruling that, after forty days of inaction by the Agriculture Department, automatically became "final agency action" and triggered Title VII's ninety-day time limit for Al-Saffy to file suit in court. That was error.

**1**

Title VII and the implementing regulations impose a ninety-day limitations period for a federal employee or applicant for employment to file suit in federal court that starts to run upon the employee's "notice of final action taken by" the employing agency. 42 U.S.C. § 2000e-16(c); *see* 29 C.F.R. § 1614.407(a) & (c). But by its plain text, the ALJ order on Al-Saffy's 2011 Complaint did not finally terminate the agency proceedings or in any way dispose of the merits of the complaint in a manner that could transmogrify the ALJ order into "final [agency] action" or a "final [agency] decision," 29 C.F.R. § 1614.407(a). Quite the opposite: all the order did was dismiss Al-Saffy's "hearing request" before the ALJ, and send the 2011 Complaint back to the Agriculture Department, specifically instructing that "the Agency"—that is, the Department of Agriculture—"shall issue a final decision in accordance with the procedures set forth at 29 C.F.R.

§ 1614.110(b)[],” unless Al-Saffy filed suit in the interim. J.A. 97. In other words, all that the order did was return the complaint to the same status—pending before the agency—that it had prior to Al-Saffy's request for an ALJ hearing. *See Hunter v. Keisler*, No. 06-5908, 2007 WL 3171223, at \*4 (D.N.J. Oct. 27, 2007) (By withdrawing a hearing request, the employee "effectively requested an 'immediate final decision' requiring the Agency to issue a final decision with findings on the merits of each issue in the complaint.") (citing 29 C.F.R. § 1614.110(b)).

That, in fact, is why the ALJ invoked Section 1614.110(b) in returning the complaint to the agency. That Section provides a mechanism for the agency itself to take final agency action on a complaint—sans an ALJ decision or hearing—within a defined time period. 29 C.F.R. § 1614.110(b). To constitute final agency action under that Section, the decision "shall" include "findings by the agency on the merits of each issue in the complaint, or, as appropriate, the rationale for dismissing any claims in the complaint and, when discrimination is found, appropriate remedies and relief[.]" *Id.* In addition, the agency decision must "contain notice of the right to appeal to the Equal Employment Opportunity Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for appeals and lawsuits." *Id.*

There is no dispute that the Agriculture Department never issued any decision containing those required components prior to Al-Saffy filing suit in federal court. And importantly, Section 1614.110(b) makes no provision for any ALJ ruling to metamorphose into a time-limit-triggering "final [agency] action" if the agency itself fails to act.

That means that the ALJ order dismissing the 2011 Complaint put the ball in the Agriculture Department's court,

and there it stayed, awaiting final agency action, without triggering any limitations period for Al-Saffy to file suit. Further proof of that procedural posture comes straight from the agency's mouth. On February 12, 2014 (four months after Al-Saffy had filed suit), the Agriculture Department issued a "Final Agency Decision" on the 2011 Complaint. That decision acknowledged that the ALJ order dismissed only the hearing request and "remand[ed] the complaint to the Agency to issue a Final Agency Decision." J.A. 100. The decision further identifies itself as final agency action "[i]n accordance with the [Equal Employment Opportunity Commission] regulations at * * * § 1614.110(b)," J.A. 99, and dismisses Al-Saffy's complaint "in its entirety," *id.* at 100 (citing 29 C.F.R. § 1614.307(a)(3) (authorizing dismissal where there is a pending civil action by the employee)). Finally, that agency decision provides the required notice of Al-Saffy's rights to appeal to the Commission or to file a civil action in federal district court. J.A. 100–103.

In sum, because the ALJ order dismissing Al-Saffy's hearing request on his 2011 Complaint and remanding for agency action under Section 1614.110(b) was not and could not become final agency action, Al-Saffy never became subject to the ninety-day clock for filing suit on which the district court relied to dismiss this case. Instead, the only relevant timing provision for Al-Saffy was Section 1614.407(b), which, when the Agriculture Department failed to act, gave Al-Saffy the *option* to file suit in court any time "[a]fter 180 days from the date of filing" the administrative complaint with that agency. 29 C.F.R. § 1614.407(b). There is no dispute that Al-Saffy's federal court complaint was timely filed under that provision.

**2**

Rather than accept the ALJ order on its own express terms, the district court treated the order as implicating 29 C.F.R. §§ 1614.109 and 1614.110(a). But neither provision applies.

Section 1614.109 governs ALJ "hearings" and corresponding ALJ decisions, and it authorizes ALJs to "dismiss complaints pursuant to § 1614.107." 29 C.F.R. § 1614.109(b). Section 1614.109 also provides that, once an ALJ issues a "decision on the complaint" and "order[s] appropriate remedies and relief where discrimination is found," then that ALJ decision will become "final [agency] action" forty days later as long as the agency does not, in the interim, issue its own final order responding to the ALJ decision. *Id.* § 1614.109(i); *see id.* § 1614.110(a) (ALJ decisions under Sections 1614.109(b), (g), or (i) require final agency action within forty days.). On that basis, the district court concluded that the order dismissing the 2011 Complaint became final agency action forty days after the order issued, which then started the ninety-day clock for filing suit.

The problem is that the ALJ order dismissing the 2011 Complaint bears no resemblance to a Section 1614.109 decision by an ALJ. The order certainly was not a dismissal "pursuant to § 1614.107," as Section 1614.109(b) requires. Section 1614.107(a) lists nine grounds for dismissing the "entire complaint." 29 C.F.R. § 1614.107(a). But the ALJ order plainly did not dismiss the "entire complaint." It dismissed only the "hearing request," and sent the entire complaint back to the agency for further proceedings. J.A. 97 ("Pursuant to the Complainant's attached Notice of Withdrawal dated March 29, 2013, the *hearing request* for the captioned matter is hereby DISMISSED.") (emphasis added). Moreover, the dismissal was *not* for any of the grounds enumerated in 29 C.F.R. § 1614.107(a)(1)–(9). The ALJ did not find that the complaint failed to state a claim, failed to

comply with applicable time limits, was the basis of a then-pending civil action, was the subject of a negotiated grievance procedure, was moot or premature, challenged the processing of a previous complaint, or reflected "a clear pattern of misuse of the EEO process." *Id.* at § 1614.107(a)(1)–(5), (8), (9). Nor did the ALJ find that Al-Saffy could not be located or had failed to respond to agency requests for necessary information. *Id.* § 1614.107(a)(6) & (7).

Neither did the ALJ order fall within any other part of Section 1614.109. The ALJ did not grant summary judgment on the merits or find that "some or all facts are not in genuine dispute." 29 C.F.R. § 1614.109(g). Nor did the order qualify as a decision under Section 1614.109(i). That subsection requires a substantive "decision on the complaint"—one that "order[s] appropriate remedies and relief where discrimination is found." *Id.* § 1614.109(i). Subsection 1614.109(i) also presupposes that an actual hearing was conducted because it directs the ALJ to "send copies of the hearing record, including the transcript, and the decision to the parties." *Id.* The ALJ order did none of those things.

The district court likewise erred in relying on Section 1614.110(a), and its parallel provision transforming an ALJ decision into "[f]inal action by an agency" after forty days of agency inaction. Section 1614.110(a) only applies to ALJ orders that "issue[] a decision under § 1614.109(b), (g) or (i)." 29 C.F.R. § 1614.110(a). As noted, there was no Section 1614.109(b), (g), or (i) decision in this case.

In sum, the ALJ order was not the result of a "hearing," a dismissal of the "entire complaint," a determination on summary judgment, or a "decision on the complaint." 29 C.F.R. §§ 1614.109(b), (g), (i). Instead, the ALJ order forwent a hearing, eschewed deciding anything, and told the *agency* to make a decision on the complaint. Such inaction

and non-decision does not create final agency action, and thus is incapable of triggering Title VII's ninety-day time limit for filing suit, *see* 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407(a).

**B**

The ALJ order dismissing the 2012 Complaint poses a closer question. While the order on the earlier complaint only dismissed the hearing request, this ALJ order directed that the "*case* is DISMISSED," but then added that it was "pursuant to the attached letter from Complainant's Attorney withdrawing his request for a hearing[.]" J.A. 93 (emphasis added).

The district court again concluded that the ALJ order became final agency action after forty days. But, as with the order on the 2011 Complaint, this ALJ order does not fit well into the categories of ALJ decisions that are covered by Section 1614.110(a)'s provisions for ripening into final agency action. The order did not purport to grant summary judgment, *see* 29 C.F.R. § 1614.109(g), or to issue a substantive decision after a hearing, *see id.* § 1614.109(i). Nor did it "dismiss [the] complaint[] pursuant to § 1614.107," *id.* § 1614.109(b), because none of those categories of dismissal applied, *id.* § 1614.107(a).

Having said that, it cannot be overlooked that the ALJ order on the 2012 Complaint dismissed the "case," and not just the hearing request, J.A. 93, so it differs in that respect from the order on the 2011 Complaint. Perhaps the signification of that language dismissing "the case" is undermined by the order's immediate reference to Al-Saffy's "attached letter withdrawing his request for a hearing." J.A. 93. After all, the ALJ order did not purport to resolve the dispute between the employee and the agency, and therefore did not dismiss the "complaint" as contemplated by Section 1614.109(b).

We need not try to untie that Gordian knot and definitively determine whether the order on the 2012 Complaint could have potentially ripened into the type of final agency action that would trip the ninety-day filing limit. That is because the order indisputably did not provide Al-Saffy the required notice of his rights to further review.

Title VII itself expressly conditions the start of the ninety-day time limit for filing suit on the employee's "receipt of notice of final action taken by a department, agency, or unit[.]" 42 U.S.C. § 2000e-16(c). This court has held, moreover, that notice of final agency action alone does not start that ninety-day clock running if unaccompanied by "notice (1) of [the employee's] right to file a civil action and (2) of the * * * time limit on filing such action." *Williams v. Hidalgo*, 663 F.2d 183, 186 (D.C. Cir. 1980). We held in *Williams* that Title VII "*itself* required that notice of final agency action *include notice of the right to sue and of the [then] thirty-day limitation*." *Id.* at 187 (citing *Coles v. Penny*, 531 F.2d 609, 614 (D.C. Cir. 1976)) (emphasis in *Williams*). Accordingly here, just as in *Williams*, "to start the running of the time limitation of the statute, [the Department] was required by regulation, statute and by court decision to notify [the employee] of [the] right to sue in federal court and of the [time] limit for bringing such an action," 663 F.2d at 187.

On its face, the ALJ order dismissing Al-Saffy's 2012 Complaint omitted that statutorily required notice. That alone bars application of the ninety-day limitation period. Indeed, it would be perverse if this cursory ALJ order entirely omitting any form of notice, could—through agency inaction no less—replace the final agency action that should otherwise have provided notice to the employee. We thus agree that "[i]t would frustrate the very purpose of the notice regulations to hold that ALJ decisions may automatically trigger the statute of limitations without providing notices equivalent to

those required by § 1614.110." *Staropoli v. Donahoe*, 786 F. Supp. 2d 384, 390 (D.D.C. 2011); *see Moncus v. Johanns*, No. 2:03-cv-416, 2006 WL 163309, at *8 (M.D. Ala. 2006) ("Construing § 1614.109(i) to start a complainant's appeal clock without notice from the agency or the administrative judge regarding the claimant's right to appeal to the EEOC or file a civil action and the applicable time limits would be contrary to the purpose of the regulation, which clearly contemplates formal notice to the complainant of appeal procedures.").

Because Title VII requires final agency action to notify the employee of his right to appeal and the governing time limitation, the order dismissing the 2012 Complaint did not trigger the ninety-day deadline for Al-Saffy to file suit. Instead, given the lack of timely final action by the agency, Al-Saffy could have and did file a civil action more than 180 days after the filing of the 2012 Complaint with the agency (that is, any time after September 23, 2012). *See* 29 C.F.R. § 1614.107(b). Al-Saffy's October 10, 2013 filing in district court thus preserved his claims from the 2012 Complaint.

## C

Al-Saffy's claims against the State Department lack the procedural complexity of his claims against the Department of Agriculture. Nevertheless, the district court also erred in granting summary judgment for the government on those claims because there are genuine issues of material fact regarding whether Al-Saffy had an employment relationship with the State Department within the meaning of Title VII, and whether Al-Saffy knew about the State Department's alleged role in discrimination against him prior to 2013.

**1**

To invoke Title VII's protection against the State Department, Al-Saffy had to establish, among other things, that he was an "employee[]" of that agency. 42 U.S.C. § 2000e-16(a) (covering "personnel actions affecting *employees or applicants for employment*" with a federal department or agency) (emphasis added). That is because, as applied to the federal government, Title VII "cover[s] only those individuals in a direct employment relationship with a government employer." *Spirides v. Reinhardt*, 613 F.2d 826, 829 (D.C. Cir. 1979). Unfortunately, Title VII includes only a "completely circular" definition of the term "employee." *Clackamas Gastroenterology Associates v. Wells*, 538 U.S. 440, 444 (2003) (further describing the statutory definition as "nominal" and "explain[ing] nothing") (citations and internal quotation marks omitted); *see* 42 U.S.C. § 2000e(f) (defining "employee" as "an individual employed by an employer").

Accordingly, we must consult "traditional agency law principles" to determine whether Al-Saffy was an employee of the State Department. *See Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 323 (1992). In analyzing employment status, the "common-law element of control is the principal guidepost[.]" *See Clackamas*, 538 U.S. at 448 (analyzing employment status under the Americans with Disabilities Act).

Hewing to common-law principles, we have recognized that an individual may be jointly employed by two or more entities. *See Redd v. Summers*, 232 F.3d 933, 938–939 (D.C. Cir. 2000). Indeed, "at common law, one could be a dual servant acting for two masters simultaneously or a borrowed servant who by virtue of being directed or permitted by his master to perform services for another may become the servant of such other." *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 215 (3d Cir. 2015) (internal quotation marks omitted); *see*

*also, e.g.*, *Butler v. Drive Automotive Industries of America*, 793 F.3d 404, 409 (4th Cir. 2015) ("The joint employment doctrine captures instances in which multiple entities control an employee.").

We have recognized two largely overlapping articulations of the test for identifying joint-employer status. *See Redd*, 232 F.3d at 938–939. The first, taken from *Spirides v. Reinhardt*, speaks in terms of the "'economic realities' of the work relationship," emphasizing whether the "employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved." 613 F.2d at 831–832. A second articulation borrows language from *NLRB v. Browning-Ferris Industries of Pennsylvania*, 691 F.2d 1117 (3d Cir. 1982), asking whether the employer, "while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer," *id.* at 1123. *See Redd*, 232 F.3d at 938.

As their language indicates, in both cases the touchstone is control. And because Al-Saffy came forward with evidence creating a genuine dispute concerning the State Department's control over his work and employment, the district court should not have granted summary judgment.

Specifically, Al-Saffy put forth evidence showing that, "although [he] was not officially employed by State, he reported directly to the Ambassadors of Saudi Arabia and Yemen, who are State employees." Pet. Br. 22; *see also Al-Saffy v. Vilsack*, 54 F. Supp. 3d 79 (D.D.C. 2014) (No. 13-01562), ECF No. 14, Pl.'s Opp. to Def.'s Mot. to Dismiss at 9. In addition, the record includes identical letters sent by Secretary Vilsack to the American Chargé d'Affaires in Saudi Arabia and the American Ambassador in Yemen on the

occasion of Al-Saffy's appointment as Trade Office Director, in which Secretary Vilsack wrote: "[Al-Saffy] will report directly to you, so that you will be fully informed of his activities in Saudi Arabia. I know that Dr. Al-Saffy will be a valuable addition to your staff and a good team player." J.A. 107, 109. Those letters are relevant evidence that Al-Saffy's work abroad was controlled at least in part by the State Department.

In addition, the affidavits of Angie Bryan, the Deputy Chief of Mission in Yemen, and Stephen Seche, Ambassador to Yemen, offer further corroborative evidence for Al-Saffy. Bryan described how Al-Saffy's allegedly unprofessional behavior and "accusational style of communication" caused "disruption in the embassy, negatively impacted morale and disproportionately consumed [the Deputy Chief of Mission's] and the Ambassador's time." J.A. 54 (Bryan Decl. ¶ 22). That conduct would have directly implicated Bryan's managerial responsibilities. *See id.* at 50 (Bryan Decl. ¶ 4) ("As [Deputy Chief of Mission], I was responsible for the day-to-day oversight of the embassy, including personnel issues, morale issues, and other management concerns."). Indeed, Bryan and Seche both had recommended Al-Saffy's removal from his Yemen post shortly before it occurred. *See id.* at 54–55 (Bryan Decl. ¶ 26) ("[T]he Ambassador sent three email messages to USDA * * * express[ing] his growing conviction, which I shared, that a reassignment of coverage needed to be made for the Yemen ATO. Although USDA had requested that we allow Dr. Al-Saffy time to mend relations with embassy staff, and we had hoped that such could occur, by August 2010 the Ambassador and I were of the opinion that a reassignment needed to occur."); *Id.* at 49 (Seche Decl. ¶ 9) ("I became convinced that Dr. Al-Saffy's style and manner of interacting with our * * * [s]taff and embassy personnel had become so disruptive and unhelpful that a reassignment of the ATO to another post was the best outcome for all involved.").

Notably, the federal chief of mission statute further supports Al-Saffy's account of his relationship with the Department of State. The statute grants the United States ambassador in a foreign country plenary authority over other executive branch employees in that country. *See* 22 U.S.C. § 3927(a)(1) ("[T]he chief of mission to a foreign country * * * shall have full responsibility for the direction, coordination, and supervision of all Government executive branch employees in that country (except for Voice of America correspondents on official assignment and employees under the command of a United States area military commander)[.]"); *see also id.* § 3902(3) (The chief of mission is "the principal officer in charge of a diplomatic mission of the United States or of a United States office abroad which is designated by the Secretary of State as diplomatic in nature."). The statute also requires other agencies "having employees in a foreign country" to "keep the chief of mission to that country fully and currently informed with respect to all activities and operations of its employees in that country, and [to] insure that all of its employees in that country * * * comply fully with all applicable directives of the chief of mission." *Id.* § 3927(b).

Taken in the light most favorable to Al-Saffy, the summary judgment record, including the letters to the embassies and the affidavits of Bryan and Seche, reinforced by the chief of mission statute, discloses genuine questions of material fact about whether the State Department exercised sufficient control over Al-Saffy's employment in Yemen to be his joint employer.

**2**

The district court also grounded dismissal in Al-Saffy's purported failure to timely exhaust administrative remedies before filing suit. Regulations require "[a]n aggrieved person [to] initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of

personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105. But "if an employee did not at the time [of the alleged discriminatory action] know or have reason to know that an employment decision was discriminatory in nature, the time limits for filing an administrative complaint may be tolled." *Stoller v. Marsh*, 682 F.2d 971, 974 (D.C. Cir. 1982). "The time within which EEO counseling must be sought is likewise tolled until the claimant knows or has reason to know the facts that would support a charge of discrimination." *Loe v. Heckler*, 768 F.2d 409, 418–419 (D.C. Cir. 1985).

Al-Saffy alleges that he was unaware that the State Department had participated in the decision to remove him as Director of the Yemen Trade Office until February 2013. That was when the Department of Agriculture filed a motion for summary judgment in district court on the 2011 Complaint, and attached the affidavits of Bryan and Seche. Both described their concerns about Al-Saffy's work style, and their role in recommending his dismissal close in time to his actual termination from the Trade Office post. *See* J.A. 54–55 (Bryan Decl. ¶ 22–26); *Id.* at 49 (Seche Decl. ¶ 9). In particular, Bryan described multiple conversations and emails between Seche and the Agriculture Department, in which Seche described problems with Al-Saffy and expressed his opinion, which Bryan shared, that "a reassignment [of the Yemen Trade Office Director responsibilities] needed to occur." *Id.* at 55 (Bryan Decl. ¶ 26).

Al-Saffy also alleges that Bryan's affidavit revealed for the first time that Bryan and Seche relied on information received from Roland McKay, the State Department Economic/Commercial Officer in the Yemen embassy, in advocating for Al-Saffy's removal. J.A. 18 (Compl. ¶ 66). Indeed, Bryan's affidavit demonstrates that her negative impressions of Al-Saffy stemmed in large part from McKay's reports. *See, e.g.*, *id.* at 53–54 (Bryan Decl. ¶ 21) ("I came to

learn from Mr. McKay * * * that Dr. Al-Saffy regularly treated [other embassy employees] rudely and dismissively and viewed Mr. McKay's role—limited as it was—as inappropriately interfering with Dr. Al-Saffy's work in Yemen."). Al-Saffy explained in his EEO complaint to the State Department: "I believe that Mr. McKay provided false information about me to Ms. Bryan and Mr. Seche based on my race, national origin and religion." *Id.* at 91. He added that "Ms. Bryan and Mr. Seche accepted the false information provided by Mr. McKay as true because of my race, national origin and religion." *Id.*

Taken in the light most favorable to Al-Saffy, his receipt of those affidavits in 2013 marked the first time that he learned that senior State Department officials had specifically recommended his removal from his Yemen post. Al-Saffy also discovered at that same time that senior State Department officials relied on allegedly false information provided by another State Department employee in making that recommendation. Those newly discovered facts provided Al-Saffy with the basis for his claims that State Department officials discriminated against him by sharing false information, crediting that false information, and then recommending his removal.

The government counters that Al-Saffy knew of his claim against the State Department in 2010 because his complaint alleges that McKay repeatedly interfered with his work in 2009 and 2010. *See* J.A. 9–10 (Compl. ¶¶ 21, 22). The complaint also alleges that, in 2010, Al-Saffy emailed Bryan, "stating that he was considering filing an EEO complaint" regarding McKay's conduct. *Id.* at 16–17 (Compl. ¶ 58).

That argument misunderstands the basis for Al-Saffy's complaint against the State Department, which was that he was "removed from [his] assignment as Director for the Yemen [Trade Office]." J.A. 86. Al-Saffy's apparent knowledge of

troubling conduct by a State Department official that was not (at that time at least) connected to his termination from the Yemen position does nothing to establish that he was aware of the involvement by State Department higher-ups in the alleged discriminatory reassignment of his Yemen responsibilities. As to the latter event, it was the Bryan and Seche affidavits that first disclosed the State Department's direct role.

The government also points to the 2011 Complaint, the scope of which covered the Agriculture Department's decision to remove him from the Yemen Trade Office position. *See* J.A. 12 (Compl. ¶ 36). That too misses the point. Neither Al-Saffy's awareness that the Agriculture Department removed him nor his invocation of the EEO process put him on notice that an entirely different agency—the State Department—played an allegedly critical role in his termination from his position in Yemen.[3]

In short, Al-Saffy has created a genuine issue of material fact concerning whether he learned of the State Department's involvement in his removal prior to receipt of the Bryan and Seche affidavits on February 21, 2013. Because Al-Saffy contacted the State Department's EEO office within forty-five days of receiving those affidavits, his claim of timely administrative exhaustion should have survived summary judgment.

---

[3] In dismissing Al-Saffy's administrative complaint, the State Department deemed Al-Saffy's claims untimely, "[p]resum[ing]" that the Bryan and Seche affidavits were included in the investigatory report on the 2011 Complaint, which would have been delivered to Al-Saffy long before 2013. J.A. 87. That defies chronological time: the Seche and Bryan affidavits were executed in 2013, so could not possibly have been included in the report that Al-Saffy received two years earlier on November 20, 2011.

## III

Al-Saffy properly filed EEO complaints against the Agriculture and State Departments alleging discrimination on the basis of national origin, religion, and retaliation. Because no final agency action ever issued as to his 2011 Complaint, he timely filed this civil action on October 10, 2013, and properly preserved the claims in that complaint. Because any final agency action on his 2012 Complaint failed to notify him of his right to appeal and the process for doing so, his lawsuit also timely raised those claims. Finally, because Al-Saffy created genuine issues of material fact as to whether he was an "employee" of the State Department within the meaning of Title VII, and whether he timely initiated contact with an EEO counselor at the State Department, his claims against that Department also should have survived summary judgment.

We accordingly reverse the district court's judgment and remand for further proceedings consistent with this opinion.

*So ordered.*