*Felder v. USTA*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2020

(Argued: January 27, 2021      Decided: March 7, 2022)

No. 19-1094

———————————————————

SEAN G. FELDER

*Plaintiff-Appellant*

-v.-

UNITED STATES TENNIS ASSOCIATION

*Defendant-Appellee,*

UNITED STATES TENNIS ASSOCIATION INCORPORATED, REED SMITH LLP

*Defendants.*[1]

———————————————————

On Appeal from the United States District Court
for the Southern District of New York

———————————————————

---

[1] The Clerk of Court is respectfully directed to amend the caption as set forth above. Plaintiff-Appellant does not appeal the District Court's dismissal of his claims against Reed Smith LLP. *See* Reply Br. at 1 n.1.

Before: LIVINGSTON, *Chief Judge*, CABRANES and LYNCH, *Circuit Judges*.

Sean G. Felder appeals the dismissal by the United States District Court for the Southern District of New York (Ramos, *J.*) of his amended complaint alleging that the United States Tennis Association ("USTA") discriminated and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2, 2000e–3(a), and discriminatorily interfered with his employment contract with AJ Squared Security, in violation of 42 U.S.C. § 1981, by rejecting his temporary assignment as a security guard for the 2016 U.S. Open. We concur with the District Court that Felder has failed to state any claim for relief under Title VII or § 1981. First, Felder did not plausibly allege the existence of an employer-employee relationship necessary to sustain his Title VII claims. Second, Felder did not allege any facts to support his claim under § 1981 that, but for his race, the USTA would not have interfered with his employment contract. However, because Felder—represented by court-appointed counsel for the first time on appeal—has indicated that he can plead further allegations of a "joint employer" relationship, and because Felder has plausibly alleged that the USTA rejected his assignment in retaliation for his protected activities against a USTA subcontractor, we **VACATE** the District Court's dismissal of Felder's Title VII retaliation claim under 42 U.S.C. § 2000e–3(a), and **REMAND** with instructions that Felder be permitted to amend his complaint as to that claim. We otherwise **AFFIRM** the District Court's dismissal with prejudice of Felder's remaining Title VII and § 1981 discrimination claims.

Judge Lynch dissents in part in a separate opinion.

| | |
|---|---|
| FOR PLAINTIFF-APPELLANT: | REBECCA LYN GUTHRIE, Michael W. Martin, Ian Weinstein, Quinn D'Isa, Sophia Porotsky, Elena Cicognani (*on the brief*), Lincoln Square Legal Services Inc., Fordham University School of Law, New York, NY |
| FOR DEFENDANT-APPELLEE: | STEPHANIE WILSON, Reed Smith LLP, Princeton, NJ |

DEBRA ANN LIVINGSTON, *Chief Judge*:

This case presents the question of what a Title VII plaintiff must adequately allege to plead the existence of an employer-employee relationship pursuant to the "joint employer" doctrine. It has long been understood by our Court that "the existence of an employer-employee relationship is a primary element of Title VII claims." *Gulino v. N.Y.S. Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006). To that end, we have remarked that when, for example, "a plaintiff is found to be an independent contractor and not an employee . . . the Title VII claim must fail." *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008). The plausible existence of a requisite employer-employee relationship is thus a cornerstone of an adequately pled Title VII complaint.

Nonetheless, in alleging an employer-employee relationship, an employee is not squarely limited to claims against his or her *formal* employer. Pursuant to the "joint employer doctrine," an employee may assert Title VII liability against a "constructive employer"—an entity that shares in controlling the terms and conditions of a plaintiff's employment. *See Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005). Most commonly, the "joint employer doctrine" applies "where the plaintiff's employment is subcontracted by one employer to

3

another, formally distinct, entity." *Gulino*, 460 F.3d at 378. Although this Court has not previously identified a specific test for determining what renders an entity a "joint employer" in a Title VII case, today we join our sister Circuits in concluding that non-exhaustive factors drawn from the common law of agency, including control over an employee's hiring, firing, training, promotion, discipline, supervision, and handling of records, insurance, and payroll, are relevant to this inquiry.

Defendant-Appellee, the United States Tennis Association ("USTA"), contracts with security firms that employ and assign security guards to work at USTA events—most notably, the U.S. Open Tennis Championships ("U.S. Open").[2] In 2016, AJ Squared Security ("AJ Security"), a security firm, hired Plaintiff-Appellant Sean G. Felder ("Felder") as a security guard and assigned him to work at the 2016 U.S. Open. On August 29, 2016, Felder's AJ Security supervisor sent Felder to pick up his security credentials from the USTA. Felder alleges, however, that the USTA refused to issue his security credentials, thereby prohibiting him from working at the U.S. Open. Felder sued the USTA pursuant

---

[2] "The US Open Tennis Championship is the premier professional tennis event in the United States and is one of the four most important tournaments in the world, which collectively comprise the prestigious 'Grand Slam[]' of tennis." App'x 70.

4

to Title VII and also 42 U.S.C. § 1981, alleging that it denied his credentials because of his race and in retaliation for a lawsuit that he had previously filed in 2012 against CSC Security Services ("CSC"), another firm providing security to the USTA.

The parties do not dispute that AJ Security was Felder's formal employer. But Felder argues that his complaint adequately alleges that the USTA was his joint employer and therefore subject to Title VII's prohibitions on discrimination and retaliation. We disagree. An entity can only be liable under Title VII as a joint employer for *rejecting* the temporary assignment of a contractor's employee if the entity would have been the employee's joint employer had it *accepted* his assignment. To plausibly allege that the parties intended to enter into a joint-employment relationship, then, a plaintiff must allege that the entity *would have* exercised significant control over the terms and conditions of his employment by, for example, training, supervising, and issuing his paychecks. Because Felder's complaint is devoid of any such allegations, his Title VII claims must fail.

We therefore find no error in the dismissal by the United States District Court for the Southern District of New York (Ramos, *J.*) of Felder's Title VII claims and affirm the dismissal of Felder's Title VII discrimination claim under 42 U.S.C.

5

§ 2000e–2.[3]   However, we vacate the District Court's dismissal of Felder's Title VII retaliation claim under § 2000e–3(a), because Felder *has* plausibly alleged that the USTA denied his credentials in retaliation for the lawsuit he filed against his former employer, CSC, and has further represented that he can plead additional indicia of a joint employer relationship now that he is represented by counsel. We therefore remand with instructions that Felder be permitted to amend his complaint as to that claim.   We separately affirm the District Court's dismissal of Felder's § 1981 claim because he has failed to plausibly allege that the USTA interfered with his employment contract with AJ Security because of his race.

# BACKGROUND

## I.   Factual Background[4]

The USTA contracts with security firms that hire and assign their security guards to work at various USTA events, including the annual U.S. Open.   From

---

[3] As to his discrimination claim, Felder also failed to plausibly allege that the USTA discriminated against him on the basis of race in refusing him security credentials.

[4] "In determining the sufficiency of [Felder's] Amended Complaint," the District Court "consider[ed] the allegations of race discrimination and retaliation set forth in both [his] Original Complaint and [his] Amended Complaint," because Felder had simply "restate[d] all of the allegations contained in [his] Original Complaint."   App'x 182 n.1. The District Court also considered additional factual allegations appearing in supplemental letters that Felder submitted to the court.   Because we liberally construe the pleadings and submissions of *pro se* litigants, *see McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017), the factual background presented here is similarly

6

2002 to 2009, Felder, a Black man residing in New York City, worked as a security guard for CSC, a USTA contractor, to provide seasonal security work for the USTA. In 2012, Felder filed a lawsuit against CSC for discriminatory and retaliatory refusal to hire under Title VII, 42 U.S.C. § 1981, and the New York City Human Rights Law, alleging that CSC refused to hire him in 2010 after he complained "[d]uring his employment [at the U.S. Open] in 2009 . . . that African American security personnel were given inferior assignments and White security personnel were given the better assignments." *See* Plaintiff's Second Amended Complaint at 3, *Felder v. Contemp. Sec. Servs.*, No. 1:12-cv-07486 (S.D.N.Y. Aug. 20, 2014), ECF No. 51. The parties reached a settlement for an undisclosed amount in 2015. *See* Stipulation of Final Dismissal with Prejudice, *Felder v. Contemp. Sec. Servs.*, No. 1:12-cv-07486 (S.D.N.Y. July 22, 2015), ECF No. 103.

Felder was later hired as a security officer by AJ Security in August 2016. AJ Security is alleged to be a subcontractor of CSC, which in turn contracts with the USTA to provide security for USTA events.[5] AJ Security assigned Felder to

---

derived from allegations in Felder's complaints and submissions to the District Court, which we accept as true in considering a motion to dismiss.

[5] It is unclear if AJ Security contracts directly with the USTA, or if AJ Security is a subcontractor of CSC. The District Court stated that "AJ Security appears to be a subcontractor of CSC," App'x 182, and Felder does not dispute this characterization on appeal. We therefore presume for purposes of resolving this dispute that AJ Security is

work as a temporary security guard at the 2016 U.S. Open. Felder's supervisor at AJ Security, Terrence Rauls, told Felder to "go to the [USTA] credential office at Flushing, Queens NY on August 29, 2016" to pick up his security credentials for the U.S. Open. App'x 101. When Felder went to pick up his credentials, he was told by an unidentified woman that his name was not in the system. Felder called his supervisor at AJ Security, who allegedly told him that the USTA denied his credentials as retaliation for his earlier employment discrimination complaint against, and settlement with, CSC.[6] Without security credentials, Felder was unable to work at the U.S. Open.

## II. Procedural History

Shortly after the USTA denied Felder his security credentials, Felder filed a verified complaint against the USTA with the New York State Division of Human

---

a subcontractor of CSC, which in turn contracts with the USTA.

[6] Felder variously alleges that (1) the "USTA retaliated due to [the] 8/3/10 complaint [against] CSC Security," App'x 14, that (2) the "USTA retaliated" because he "won" his case against CSC in 2015, *id.* at 15, (3) that "due to [the] Jan. 2015 settlement vs [sic] CSC Security" the USTA "blackball[ed]" him and denied his credentials "due to past bad press against CSC Security," *id.* at 143, and (4) that "T[errence] Rauls" told him "on [the] phone . . . that [the] USTA den[ied him his] US Open Tennis work credential due to 8/3/10 incident with former CSC VP S. Dennison," *id.* at 147. We understand these allegations to collectively assert that the USTA denied Felder's work credentials due to the 2012 lawsuit he filed in connection with CSC's refusal to hire him in 2010, resulting in a 2015 settlement between the parties.

8

Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging discriminatory and retaliatory treatment in violation of the New York State Human Rights Law and Title VII. On February 27, 2017, the NYSDHR dismissed his complaint, stating that "[t]he Division investigation established that [the USTA] did not employ [Felder] in any capacity," and that "the Division [could not] conclude that there was a violation of the State Human Rights Law as alleged." App'x 67. On May 1, 2017, the EEOC adopted the findings of the NYSDHR and issued Felder a notice of right-to-sue.

On July 5, 2017, Felder filed this lawsuit against the USTA, alleging claims of discrimination and retaliation under Title VII and 42 U.S.C. § 1981, along with an array of other claims. The USTA moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing, *inter alia*, that Felder had not alleged a prima facie case of employment discrimination or retaliation because Felder "did not apply for a position at the USTA" and the USTA was therefore not his employer. Memorandum of Law at 4, *Felder v. U.S. Tennis Ass'n*, No. 1:17-cv-05045-ER (S.D.N.Y. May 25, 2018), ECF No. 30.

The District Court granted the USTA's Rule 12(c) motion to dismiss Felder's complaint. The court determined that Felder had not stated a claim under Title

9

VII or § 1981 because he had not established that an employer-employee relationship "existed between the parties at the time of the alleged unlawful conduct." App'x 127. First, the court noted that Felder was not a formal employee of the USTA, because he was never hired by or compensated by the USTA. Nor had Felder adequately alleged that he was entitled to relief under any alternate theory of employer liability, including the "single employer doctrine"—which applies "where two nominally separate entities are actually part of a single integrated enterprise"—or the "joint employer doctrine"—which applies when an "employee is at the same time constructively employed by another entity." App'x 128 (citations omitted). As to the joint employer doctrine, the District Court remarked that "Felder ha[d] not alleged that the USTA shared immediate control over him with AJ Security or CSC, and thus joint employer liability [was] inapplicable." App'x 130. The court therefore dismissed Felder's complaint but permitted Felder to replead his Title VII and § 1981 claims.

Felder replied by letter to the court that he was "not interested" in amending his complaint, asking the court when it would "force [the] USTA to settle our case." App'x 133. Ultimately, Felder did amend his complaint, not only

10

regarding the Title VII and § 1981 claims, but also adding the USTA's counsel, Reed Smith LLP, as a defendant. Felder did not provide any additional factual allegations to demonstrate that the USTA was either his formal or joint employer.

The USTA again moved to dismiss his complaint, this time under Rule 12(b)(6), arguing that Felder had failed to state a plausible claim for relief because Felder was not an employee of the USTA. Memorandum of Law at 1, *Felder v. U.S. Tennis Ass'n*, No. 1:17-cv-05045-ER (S.D.N.Y. Feb. 4, 2019), ECF No. 56. The District Court granted the motion to dismiss with prejudice, again holding that Felder had failed to allege that he was an employee of the USTA or that the USTA was Felder's joint employer, because he "did not assert any additional facts to prove the USTA shared immediate control over him with either CSC or AJ Security." App'x 187–88. This appeal followed.[7]

**DISCUSSION**

Felder appeals the dismissal of his amended complaint alleging that the USTA violated Title VII, 42 U.S.C. §§ 2000e–2, 2000e–3(a), and 42 U.S.C. § 1981 when it refused to issue his security credentials, thereby rejecting him as a security guard for the U.S. Open. We "review de novo a dismissal of a complaint for

---

[7] On appeal, Felder is now represented by Court-appointed counsel.

failure to state a claim upon which relief may be granted." *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 467 (2d Cir. 2019). Because Felder was a *pro se* litigant in the court below, we construe his submissions "liberally and interpret[] [them] to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks, emphasis, and citation omitted). Nevertheless, "even pro se plaintiffs asserting civil rights claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.'" *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## I. Title VII

We start by addressing Felder's Title VII claims. Title VII prohibits an "employer" from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. Title VII also prohibits an "employer" from "discriminat[ing] against any of his employees or applicants for employment . . . because he has opposed any practice made an

12

unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* § 2000e–3(a). In other words, an employer cannot "retaliat[e] on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 342, 133 S.Ct. 2517 (2013). Felder alleges that the USTA violated both provisions of Title VII when it refused to issue his credentials, preventing him from working as a security guard at the U.S. Open.

Felder's immediate hurdle to successfully litigating a Title VII claim against the USTA is that "the existence of an employer-employee relationship is a primary element of Title VII claims," and both parties agree that the USTA was not Felder's direct employer. *Gulino*, 460 F.3d at 370; *see also O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997) (holding that Title VII does not apply to an "unpaid intern" because she is not an "employee"); *York v. Ass'n of Bar of City of New York*, 286 F.3d 122, 123 (2d Cir. 2002) (holding that a volunteer for the Association of the Bar of the City of New York was not an employee under Title VII); *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000) ("Title VII . . . cover[s]

'employees,' not independent contractors."). We have recognized, however, that "in certain circumstances" an employee may "assert employer liability against an entity that is not formally his or her employer." *Arculeo*, 425 F.3d at 197. Pursuant to the "joint employer doctrine," one such circumstance exists when "an employee, formally employed by one entity" is "assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity." *Id.* at 198. "Where this doctrine is operative . . . [the employee] may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer." *Id.* Felder therefore argues that the USTA is subject to Title VII as his joint employer.

Our Court has previously noted that the "joint employer doctrine"—which has been employed in disputes regarding the National Labor Relations Act, *see Clinton's Ditch Coop. Co. v. N.L.R.B.*, 778 F.2d 132 (2d Cir. 1985), and the Fair Labor Standards Act, *see Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003)—is applicable in the Title VII context. *See Arculeo*, 425 F.3d at 198. In *Arculeo*, however, we caveated that we had "not yet fully analyzed or described a test for what constitutes joint employment in the context of Title VII," and because it was

14

"not necessary for our resolution of [the] case . . . decline[d] to do so [t]here." *Id.* at 199–200 n.7. To decide, then, whether the USTA is Felder's joint employer we must first determine "what constitutes joint employment in the context of Title VII."

**A**

In order to understand what makes an entity a *joint* employer, we start by examining the meaning of the terms "employer" and "employee" in Title VII. Title VII defines the term "employer" to "mean[] a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b). The term "employee" is, in turn, defined as "an individual employed by an employer." *Id.* § 2000e(f). As we have remarked, "neither definition is particularly helpful in deciding whether an employment relationship exists," because these definitions are "circular." *Gulino*, 460 F.3d at 370–71, 370 n.11.

The Supreme Court has instructed that when statutes contain "completely circular" definitions, as Title VII does, courts should apply the "'well established' principle that '[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute

15

otherwise dictates, that Congress mean[t] to incorporate the established meaning of these terms.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23, 112 S.Ct. 1344 (1992) (quoting *Comm. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739, 109 S.Ct. 2166 (1989)). Accordingly, in determining Congress's intended meaning of the terms "employer" and "employee" in statutes mirroring the circular definitions provided in Title VII, the Supreme Court has "relied on the general common law of agency." *Reid*, 490 U.S. at 740, 109 S.Ct. 2166; *see, e.g.*, *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444–45, 123 S.Ct. 1673 (2003) (applying federal common law of agency to definition of "employee" under the ADA); *Darden*, 503 U.S. at 323, 112 S.Ct. 1344 (applying federal common law of agency to definition of "employee" under ERISA).

We have thus held that the common law of agency governs the meaning of "employer" and "employee" in Title VII. *See United States v. City of New York*, 359 F.3d 83, 92 (2d Cir. 2004). This means that we apply a set of non-exhaustive factors set forth by the Supreme Court that, when present, may indicate the existence of an employer-employee relationship under the common law. *See id.*; *Gulino*, 460 F.3d at 371. These factors include:

> [T]he hiring party's right to control the manner and means by which the product is accomplished ….[;] the skill required; the source of the

16

instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in the business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* (quoting *Reid*, 490 U.S. at 751–52, 109 S.Ct. 2166); *see generally* RESTATEMENT (SECOND) OF AGENCY § 220 (1958). Broadly, these factors examine whether the alleged employer "paid [the employees'] salaries, hired and fired them, and had control over their daily employment activities," *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 214 (3d Cir. 2015) (quoting *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 119 (3d Cir. 2013)), and the crux of these factors is "the element of control." *Gulino*, 460 F.3d at 371; *see also Peppers v. Cobb Cnty.*, 835 F.3d 1289, 1297 (11th Cir. 2016) (considering "(1) how much control the alleged employer exerted on the employee, and (2) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment").

We will therefore find a *joint* employer relationship when two or more entities, according to common law principles, share significant control of the same employee. *See, e.g., Knitter v. Corvias Mil. Living, LLC*, 758 F.3d 1214, 1226 (10th

Cir. 2014) (quoting *Bristol v. Bd. of Cnty. Comm'rs of Cnty. of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002) ("Under the joint employer test, two entities are considered joint employer . . . if they both 'exercise significant control over the same employees.'"); *Plaso v. IJKG, LLC*, 553 F. App'x 199, 204 (3d Cir. 2015) (quoting *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997) ("[A] joint employment relationship exists when 'two entities exercise significant control over the same employees.'"). This means that an entity other than the employee's formal employer has power to pay an employee's salary, hire, fire, or otherwise control the employee's daily employment activities, such that we may properly conclude that a constructive employer-employee relationship exists.[8] Because the exercise

_____

[8] We are not alone in looking to common law agency factors in discerning whether a joint employer relationship exists. The Ninth and Third Circuits similarly look to common law agency principles. *See U.S. Equal Emp. Opportunity Comm'n v. Glob. Horizons, Inc.*, 915 F.3d 631, 638 (9th Cir. 2019); *Faush*, 808 F.3d at 214. The Fourth Circuit, however, applies a so-called "hybrid" test, that combines both common law agency principles with "the economic realities test." *Butler v. Drive Auto. Indus. of Am., Inc..*, 793 F.3d 404, 414 (4th Cir. 2015). The "economic realities test," which "originated . . . in a Supreme Court case from the 1940s, in which the Court was asked to resolve whether a defendant was an employee or independent contractor for purpose of determining Social Security taxes," *id.* at 411 n.8, "focuses less on the legal parameters of employment, but more on the entity (or entities) . . . which the employee relies on for work and remuneration—irrespective of who is actually writing the paychecks and determining work status," *id.* at 412.

As some courts have aptly noted, the Fourth Circuit's "hybrid" test is likely no more expansive than "the common-law inquiry," as factors relevant under the "economic realities test" are also "relevant under the common law." *Faush*, 808 F.3d at 219 n.9; *see also Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 945 (9th Cir. 2010) (concluding that

of control is the guiding indicator, factors indicating a joint-employment relationship may vary depending on the case, and any "relevant factor[] may . . . be considered so long as [it is] drawn from the common law of agency that *Reid* seeks to synthesize." *Eisenberg*, 237 F.3d at 114 n.1. We are thus mindful that "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Darden*, 503 U.S. at 324, 112 S.Ct. 1344 (quoting *N.L.R.B. v. United Ins. Co. of Am.*, 390 U.S. 254, 257, 88 S.Ct. 988 (1968)).

**B**

With these principles in mind, we assess how the joint employer doctrine applies in this case. Our challenge is that most of the joint-employment factors— *i.e.* discipline, pay, insurance, record-keeping, and supervision—presume an

---

"there is no functional difference" between the "common law agency test, an economic realities test, and a common law hybrid test") (internal quotation marks omitted)); *cf. Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir. 1993) ("[T]here is little discernible difference between the hybrid test and the common law agency test. Both place their greatest emphasis on the hiring party's right to control the manner and means by which the work is accomplished and consider a non-exhaustive list of factors as part of a flexible analysis of the 'totality of the circumstances.'"). Indeed, the Fourth Circuit has itself noted that, "the common-law element of control remains the 'principal guidepost' in the analysis" of a joint employer relationship. *Butler*, 793 F.3d at 414. We therefore do not find it necessary to distinguish between these tests, emphasizing as other Circuits have that, in discerning a joint employment relationship, "'the principal guidepost' is the element of control," *Glob. Horizons, Inc.*, 915 F.3d at 638, and the totality of the circumstances should be considered.

*existing* relationship between two parties. But here, the USTA allegedly denied Felder his credentials *before* he could start work as a temporary security guard. This leaves us to consider how to assess the pleading standards applicable to the joint employer relationship in situations where the relationship has not yet commenced in any meaningful way.

Fortunately, a different set of Title VII cases provides us with guidance: cases involving independent contractors. Under Title VII, a job applicant can sue a potential employer for discrimination. *See Gulino*, 460 F.3d at 374. However, because Title VII only protects employees and not independent contractors, *see Salamon*, 514 F.3d at 226, Title VII similarly only protects applicants for employment and "not . . . applicants for independent contractor positions." *Knitter*, 758 F.3d at 1232; *E.E.O.C. v. MCI Telecomms., Inc.*, No. 98-1195, 1999 WL 547906, at *3 (4th Cir. 1999) ("Title VII's protective reach extends beyond employees to cover job applicants, but only in the context of a potential employment relationship.").

"[A] plaintiff who has never been employed by the defendant" must therefore "prove that he or she was an 'applicant[] for employment,'" and not an applicant for an independent contractor position. *Knitter*, 758 F.3d at 1232

(quoting 42 U.S.C. § 2000e–3(a)).   To do so, she must successfully allege that "if she *had been hired*," her relationship with the alleged employer "*would have been more like a traditional employee than like a traditional independent contractor.*" *See Fabian v. Hosp. of Central Conn.*, 172 F. Supp. 3d 509, 518 (D. Conn. 2016) (emphasis added).   To determine whether she would be "more like a traditional employee" than an independent contractor, she must plead, under common law agency principles, that her alleged employer would have exerted control over the terms and conditions of her anticipated employment by, for example, training, supervising, and disciplining her.   *See, e.g.*, *id.* at 516–17; *Thomas v. Texaco, Inc.*, 998 F. Supp. 368, 370 (S.D.N.Y. 1998) (examining "common law agency principles" to discern whether the plaintiff would have entered into an employer-employee relationship had the plaintiff been "chosen for the position").   Absent any allegations indicating that the parties intended to enter into an employer-employee relationship, her Title VII claim must fail.   *See, e.g.*, *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1293–94 (9th Cir. 1999) (holding that Chrysler could not be liable under Title VII for discriminatory failure to hire because the intended relationship between the parties "was to be one of independent contractual affiliation"); *cf. Mangram v. Gen. Motors Corp.*, 108 F.3d 61, 64 (4th Cir. 1997)

21

(dismissing the plaintiff's employment discrimination claim under the ADEA because "Mangram asks us to find that he held 'employee' status as a prospective [General Motors] dealer when he would not have held that status if he had actually become a General Motors dealer").

We think that the joint employer analysis in this case should be the same, as we are tasked with assessing the same fundamental question: Did the parties contemplate an employer-employee relationship that would permit Title VII liability?   As in the cases cited above, the operative question here must be: Would the USTA have been Felder's joint employer *had* Felder worked at the U.S. Open? If not, the USTA cannot be liable under Title VII.

**C**

At the motion to dismiss stage, a plaintiff's burden to answer this question is not great.   It must only be plausible and not merely speculative, that the USTA, as Felder's alleged joint employer, would have exerted significant control over the terms and conditions of his employment as a security guard.   *See Twombly*, 550

22

U.S. at 556. But Felder's complaint is devoid of any allegations directed at this issue.

First, Felder does not allege that the USTA had any control over his hiring or firing. As our sister Circuits have remarked, a company does not *fire* a subcontractor's employee merely by requesting that the subcontractor "no longer assign" the employee to work at its facilities. *Knitter*, 758 F.3d at 1229; *see also Redd v. Summers*, 232 F.3d 933, 936–37, 940 (D.C. Cir. 2000) (noting that while "the [defendant] had the right to reject any tour guide [hired by its subcontractor] . . . [the subcontractor] did all the hiring and firing"). This is because such a request does not terminate the employee's continued employment with the subcontractor, nor prohibit the employee from working for other clients of the subcontractor. *See Knitter*, 758 F.3d at 1217; *Redd*, 232 F.3d at 940 ("[W]hile the contract gives the [defendant] the right to reject any guide . . . the decision to terminate the guide's employment with [the subcontractor] is solely within [the subcontractor's] power.").

Felder did not allege, for example, that the USTA instructed AJ Security to fire Felder upon refusing to issue his credentials. He also did not allege that AJ Security hired him for the sole purpose of working at the USTA and that the USTA

was aware that by denying his credentials it was effectively terminating his employment with AJ Security. Nor did he allege that the USTA exerted any control over AJ Security's independent hiring process.

Felder also did not allege that the USTA would have been involved in training him, supervising him, issuing his paychecks, covering his insurance or other benefits, or controlling other means of his employment (such as providing his uniform or other tools needed for the position). *Cf. Faush*, 808 F.3d at 216 ("Tuesday Morning personnel gave Faush assignments, directly supervised him, provided site-specific training, furnished any equipment and materials necessary, and verified the number of hours he worked on a daily basis"). Absent these types of factual allegations, we simply have no basis to conclude that the USTA would have been Felder's joint employer.

In fact, there is some reason to doubt that the USTA would have exercised significant control over Felder. First, the "work functions" that security guards are asked to perform for the USTA "compared to those of an ordinary [USTA] employee," appear to be different. *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 414–15 (4th Cir. 2015) (considering "whether the individual's duties are akin to a regular employee's duties" in determining "whether an individual is

24

jointly employed by two or more entities"). The USTA is "the national governing body for tennis in the United States," App'x 160, and does not appear to be in— nor does Felder make any allegation that it is in—the security guard business. This suggests that the USTA would have left control over Felder's work as a security guard to his formal employer, AJ Security. Second, the USTA's influence over AJ Security employees may have been diluted by the fact that AJ Security was a subcontractor of CSC and thus two steps removed from the USTA's immediate control.

Felder's only allegation about the control the USTA exerted is that it could effectively reject AJ Security employees by refusing to issue them credentials. We cannot conclude that this allegation alone is enough to adequately plead a joint-employment relationship. *Cf. N.L.R.B. v. W. Temp. Servs., Inc.*, 821 F.2d 1258, 1266–67 (7th Cir. 1987) (finding a joint employer relationship where the company could "refuse[] a referral" but also where the company had "exclusive control over the day-to-day activities of the part-time workers who [were] referred to it" including "train[ing], assign[ing] work, and supervis[ing] them."). There are many reasons why an entity might reasonably reject the temporary services of a subcontractor's employee. It may decide, for example, that it is already

25

sufficiently staffed for a particular event. Or it may determine that the individual lacks the requisite skill set needed for the particular role, or is otherwise unfit for the position. *Cf. Redd*, 232 F.3d at 940 ("[T]he client's command to remove a specific worker (say, on grounds of rudeness or just personal incompatibility) would hardly render the worker an employee of the client."); *Zinn v. McKune*, 143 F.3d 1353, 1356–58 (10th Cir. 1998) (holding that the Kansas Department of Corrections was not rendered an employer when it requested the reassignment of a contractor's employee for "inappropriate behavior"). The joint employer doctrine does not require that an entity exert *no* control over who may or may not work at its facilities, only that it may not exert *significant* control without being subject to Title VII.

Moreover, were it enough to say that the USTA's *refusal* to issue credentials automatically rendered it a joint employer to Felder, we would be required to say that *issuing* credentials also renders it a joint employer, as both equally demonstrate the exertion of some control over who may work as a security guard at the U.S. Open. But this would eliminate the need to consider any other indicia of a common law agency relationship in applying the joint employer doctrine; would vastly expand Title VII liability in a manner that no other Circuit has

26

endorsed; and would contravene the Supreme Court's instruction that we turn to a multi-factor analysis under the common law of agency for discerning whether an employer-employee relationship exists. *See, e.g., Clackamas*, 538 U.S. at 449–51, 123 S.Ct. 1673.

This, of course, is not to say that we are not without concern for a subcontractor's employee who, like Felder, believes that he has been denied an opportunity for discriminatory or retaliatory reasons. And we recognize, as the dissent notes, that if outside the scope of Title VII, subcontractors' employees may be vulnerable to discrimination or retaliation from companies like USTA that subcontract work rather than hire employees themselves. But Congress did not "extend Title VII liability in a general way," limiting it instead to "traditional common-law employers" and a few "additional groups" not relevant here. *Gulino*, 460 F.3d at 375. Absent further pleading to "justify the conclusion that [Felder] is being employed jointly by two distinct employers," *Arculeo*, 425 F.3d at 199, we cannot circumvent Congress's intent by expanding Title VII liability in this case. "[I]t is for Congress, if it should choose to do so, and not this court, to provide a remedy under . . . Title VII . . . for plaintiffs in [Felder]'s position." *O'Connor*, 126 F.3d at 119.

27

We therefore hold that Felder did not plausibly allege that the USTA was his employer merely by asserting that it refused to issue his credentials. Absent further allegations that the USTA would have significantly controlled the manner and means of Felder's work as a security guard, the complaint does not cross the line from speculative to plausible on the essential Title VII requirement of an employment relationship. For this reason, the District Court did not err in dismissing Felder's Title VII claims.

## II.    42 U.S.C. § 1981

That leaves us to consider Felder's remaining claim under 42 U.S.C. § 1981. Section 1981 provides that all persons "shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." Felder asserts that the USTA violated § 1981 by "intentionally thwart[ing his] employment contract, or efforts to contract for employment [with AJ Security], because of intentional racial discrimination."[9]    Appellant Br. at 28.

---

[9] In addition to claims of discriminatory interference with contract, "42 U.S.C. § 1981 encompasses claims of retaliation." *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008). On appeal, however, Felder only argues that the USTA "discriminatorily denied Mr. Felder's credentials to work the 2016 US Open," thereby "depriv[ing him] of

28

"[U]nlike Title VII," § 1981 plaintiffs can "under certain circumstances . . . sue persons other than [their] employers." *Turley v. ISB Lackawanna, Inc.*, 774 F.3d 140, 151 n.6 (2d Cir. 2014); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). We need not address, however, whether Felder can appropriately sue the USTA under § 1981 even though it is not his employer, because even assuming he can, we find that Felder has failed to plausibly allege a claim of racial discrimination.

"To establish a claim under 42 U.S.C. § 1981," a plaintiff "must allege facts supporting" that "(1) [the plaintiff is a] member[] of a racial minority; (2) defendant['s] intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000); *see also Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009, 1019 (2020) ("[A] plaintiff must initially

the right to contract for gainful employment with AJ Security." Appellant Br. at 27; *see also id.* ("Mr. Felder's *pro se* complaint states a plausible claim that the USTA interfered with his right to be free of racial discrimination in making and enforcing an employment contract."). Because Felder does not argue that his § 1981 claim is based on retaliatory interference with contract, we consider that argument waived. *See Chevron Corp. v. Donziger*, 990 F.3d 191, 203 (2d Cir. 2021).

plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right.").

Felder pled no facts suggesting that the USTA denied his security credentials *because of his race*. Nor did he offer any allegations suggesting that the USTA had a policy of not accepting Black security guards, or that he was treated differently than other "similarly situated" security guards. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010). We therefore affirm the District Court's dismissal of Felder's claim under § 1981.

## III. Request for Leave to Amend

Finally, Felder asks us to remand to the District Court so that he can amend his complaint for a second time. Ordinarily, "[w]hen a plaintiff has not moved for leave to amend in the district court, we are . . . disinclined to exercise our discretion to grant his belated request on appeal." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 171 (2d Cir. 1998). And we certainly see no error or abuse of discretion in the District Court's dismissal of Felder's complaint with prejudice, as Felder did not request leave to re-amend until this appeal, and "no court can be said to have erred

30

in failing to grant a request that was not made." *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011).

Nevertheless, Felder, now represented by counsel for the first time on appeal, has provided us with some "detail about . . . proposed new allegations" and "explained how they could cure the deficiencies that led to the dismissal of his complaint." *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 140 (2d Cir. 2011). Felder asserts that he can "ple[a]d additional USTA control mechanisms based on information and belief gleaned over years of prior experience" working at the U.S. Open, and can also "reference[] . . . the written agreement between [the] USTA and its security subcontractors" to establish the proposed relationship between the USTA and the security guards. Appellant Reply Br. at 21–22.

Moreover, we conclude that Felder's complaint, liberally read, may suggest that the USTA did in fact retaliate against him for his earlier complaint against a USTA security contractor—namely, CSC. Felder alleged that he was "hired . . . by AJ Squared Security," that AJ Security sent him to pick up his security credentials at the USTA, that the USTA denied those credentials, and that he was then informed by his AJ Security supervisor that the USTA denied his credentials because of his earlier discrimination claim against CSC. App'x 143, 174. If true,

31

and if the USTA were indeed Felder's joint employer, this could plausibly set forth a retaliation claim under Title VII. *See McMenemy v. City of Rochester*, 241 F.3d 279, 284–85 (2d Cir. 2001) (finding a retaliation claim "especially appropriate where . . . two employers have a relationship that may give one of them an incentive to retaliate for an employee's protected activities against the other.").

We therefore agree that Felder should be permitted to amend his complaint regarding his Title VII retaliation claim under 42 U.S.C. § 2000e–3(a) so that he may allege, if possible, additional indicia of a joint employer relationship. Felder has not demonstrated, however, that his failure to plead allegations necessary to support a race discrimination claim under Title VII or § 1981 can be remedied through a second amended complaint. Absent any "indication as to what [Felder] might add to [his] complaint in order to make [these claims] viable," *Wilson*, 671 F.3d at 140 (citation and quotation marks omitted), we solely exercise our discretion to vacate and remand the District Court's dismissal of Felder's Title VII retaliation claim.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the District Court's dismissal of Felder's discrimination claims under Title VII, 42 U.S.C. § 2000e–2, and 42 U.S.C.

§ 1981. We **VACATE** the District Court's dismissal of Felder's retaliation claim under Title VII, 42 U.S.C. § 2000e–3(a) and **REMAND** with instructions that Felder be permitted to amend his complaint as to this remaining claim.

GERARD E. LYNCH, *Circuit Judge*, dissenting in part:

The majority opinion today reads into the text of Title VII a loophole that allows companies to engage in precisely the type of discriminatory behavior that the statute was designed to prevent. Per the majority's interpretation of Title VII, companies can avoid liability for discriminatory behavior prohibited by Title VII through the simple mechanism of outsourcing the work of finding employees to outside agencies, even though the *company*, and *not* the outside agency, retains and exercises the ultimate power to decide whether the employee can work for the company. In the present case, it is plausibly alleged that a covered employer demanded of a security agency it had contracted to provide security guards that an employee who had displeased the company on an earlier assignment by complaining of perceived racial discrimination, a quintessential protected activity, not be assigned to work for it on a later occasion when it needed security personnel. When a company that subcontracts a necessary staffing function intercedes in the contracting agency's hiring decisions and asserts its own control over the assignment of workers in a discriminatory manner, it should be held accountable for its actions. The best interpretation of Title VII supports that result, and I therefore respectfully dissent from the majority's disposition of this case.

As frequently occurs when a case is terminated on a motion to dismiss a handwritten complaint from a legally unsophisticated pro se plaintiff, much is murky about the facts that a lawyer or judge might want to know about the present case. It is not clear, for example, whether the plaintiff Sean Felder was a regular employee of AJ Security, the security contractor that sent him to work as a security guard at the 2016 US Open tennis tournament run by defendant USTA, or whether he applied to AJ Security for the very purpose of working at the tournament.[1] But he clearly maintains that USTA delegated the provision of security guards for the tournament to AJ Security, that he sought to work at the US Open, that AJ Security both hired him and assigned him to work at USTA's tournament, and that USTA rejected him, refusing to issue him credentials and sending him back to AJ Security. It is unclear whether AJ Security had other work for him or whether he

---

[1] The tennis tournament is an annual event that runs for several weeks, and draws tens of thousands of spectators, with attendant seasonal security needs. In a number of letters to the district court, Felder talks about filling out an "application" to work at the tournament, and says that AJ Security "hired" him on August 26, 2016, the same day it sent him to pick up his credentials at the offices of USTA. Felder alleges that he had worked security at the US Open on multiple occasions, apparently (at least on some occasions) under the auspices of a different security firm. He alleges that he filed a lawsuit against that firm alleging racial discrimination he claimed to have suffered at the tournament, which resulted in a settlement, leading him to become persona non grata with USTA. Other statements made by Felder can be read as implying that he already worked, or had worked, for AJ Security on other assignments.

2

was interested in working for them other than for the seasonal assignment at the US Open.

I agree with the majority that Felder has neither pled nor proffered concrete facts to support his conclusory allegation that this rejection was based on his race. But he does offer tangible support for his claim that he was rejected by USTA based on his past opposition to perceived racial discrimination in the treatment of security employees at the US Open. He alleges that he obtained a settlement of a previous claim against CSC Security, a security contractor that had previously employed him to work at an earlier iteration of the US Open; that after AJ Security accepted his application to work at the 2016 US Open and sent him to USTA to receive credentials, USTA rejected him as a candidate, refused him credentials, and sent him back to AJ Security; and that Terence Rauls, the AJ Security supervisor who had hired him and sent him to USTA, later told him that USTA rejected him because of his history of protesting alleged discrimination. Those allegations may or may not prove true. But because USTA seeks dismissal of the complaint without even being required to deny them, we must assume them to be true, and the majority opinion does not dispute that these allegations are sufficient

3

to plausibly state a claim that USTA rejected him because of his previous protected activity.

My colleagues nevertheless affirm the dismissal of the complaint on the ground that Felder has not sufficiently alleged that if USTA *had* permitted him to work at its tournament instead of rejecting him at the threshold, USTA would then have been considered his employer under the joint employer doctrine, as that doctrine has been applied by the courts in the context of Title VII conditions of employment cases and other labor-law obligations that apply to persons already hired. Op. at 13.

The majority's opinion rests on a reading of Title VII that makes little sense in the context of a failure-to-hire claim such as Felder's. According to the majority, because an "employer-employee relationship" is "a cornerstone of an adequately pled Title VII complaint," Op. at 3, Title VII requires us to apply "a set of non-exhaustive factors" derived from the common law of agency which "may indicate the existence of an employer-employee relationship under the common law" even where the plaintiff is directly employed by a different party, Op. at 17.

That reasoning is questionable on its face. The very nature of a refusal-to-hire claim implies that the plaintiff does not have an "employer-employee

4

relationship" with the defendant. Such a plaintiff is not complaining that his employer has mistreated him; he is complaining, rather, that he has been denied any chance at employment, because the company controlling the workplace discriminates against *applicants* for work on a prohibited ground.

Nothing in the language of the relevant statute refers to joint employers or otherwise creates any specific rule for claims involving a statutory "employer" that permits or requires a staffing agency to which it delegates the hiring of workers to provide services to it to discriminate against protected categories of applicants when assigning workers to provide those services. Title VII of the Civil Rights Act of 1964, the principal source of the rights Felder claims, makes it unlawful for "employers" to "to fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), or to "discriminate against any . . . applicants for employment . . . because [the applicant] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter," *id.* § 2000e–3(a). The statutory text itself defines "employer" simply as "a person engaged in an industry affecting

5

commerce who has fifteen or more employees . . . and any agent of such a person," other than various federal entities and private clubs. 42 U.S.C. § 2000e(b). The purpose of the definition is to limit the class of individuals and corporations who are subject to federal anti-discrimination legislation, and not to define a required relationship between a statutory "employer" and the party who alleges discrimination.

In the ordinary case, of course, the party alleging discrimination is an employee or an applicant for employment, and so it will ordinarily be the case that an employment relationship between the plaintiff and defendant either exists or is being sought by the plaintiff.

In the modern workplace, employers frequently outsource the provision of services that might once have been performed by persons they directly employ to agencies that specialize in providing particular sorts of workers. Such practices provide numerous benefits to the employer company. As in the case of seasonal work such as that involved in this case, it may be inefficient for the company to recruit, screen and supervise specialized workers who are needed only for a limited (if recurring) period of time. Moreover, even for longer-term workers, a specialized agency may be better able to identify and manage employees for

6

particular function. In addition, the employer company may legitimately seek to avoid the administrative and legal burdens of assuring compliance with a variety of regulatory requirements, leaving it to the subcontracting agency to manage those burdens.

While the language of Title VII does not address such situations directly, the courts have imported doctrines from other workplace regulations, such as wage and hour laws, to allocate liability between the contracting employer and the subcontracting agency for violations of those regulatory requirements. In the ordinary case, those doctrines assign responsibility to the agency, which is the formal contractual employer of the worker. At the same time, however, courts and regulators have crafted a "joint employer" doctrine, the purpose of which is to "prevent" the delegating company from "evading liability by hiding behind another entity, such as a staffing entity." *Butler v. Drive Auto Indus. of Am., Inc.*, 793 F.3d 404, 410 (4th Cir. 2015). In order to balance the legitimate economic reasons to permit such labor subcontracting, and to be wary of improperly attributing the mistreatment by the subcontractor agency of those workers it has selected, managed and supervised to the entity for whom the services are supplied, against the need to protect both workers and the subcontracting agency from

7

mistreatment dictated solely or jointly by the company receiving the services, the joint employer doctrine relies on the complicated multi-factorial test cited by the majority in this case. *Id.* at 414. That test makes sense in the context of cases involving discrimination or violations of other workplace standards with respect to the terms and conditions of employment, and I have no quarrel with its use in such cases.

At the same time, Title VII explicitly protects *applicants* for employment. That protection is one of the primary purposes of anti-discrimination law: to prohibit the formerly common and once entirely legal practice of employers overtly refusing to hire members of disfavored groups for all or selected functions. Applicants for employment, by definition, do not yet have an employment relationship with the entity alleged to have discriminated against them. When they are refused employment, allegedly for a discriminatory reason, determining the responsibility for the refusal should be a relatively straightforward task. Like all judicial fact-finding, that task may be difficult, given the possibilities of deceit and mutual misunderstanding that are the grist of decisions by judges or juries in determining facts. But there is not the same need to sort out the complexities of interactions in the workplace between workers and supervisors formally

8

employed by the subcontracting agency and the officials of the contracting employer to whom they report. There is a simple binary decision, to hire or not to hire, to accept a worker's presence or reject it. Someone, at one company or the other, is the ultimate decisionmaker in the hiring choice.

Felder alleges that he was denied credentials by USTA to work at what may have been the sole event for which he was employed by AJ Security, in retaliation for complaining about race discrimination, a protected activity under Title VII, years earlier when he had worked for USTA while employed by a different contractor. He asserts that he was hired by AJ Security, chosen by it to work at the US Open, and sent by them to USTA, that USTA rejected him, and that he was informed by AJ Security that he was rejected because he had engaged in the protected activity of complaining about alleged discrimination that had nothing to do with AJ Security, but that had taken place while he was providing services to USTA under the auspices of a different security subcontractor. If his concrete factual allegations are true, there is no reason to think that the retaliatory animus emanated from AJ Security; the facts alleged place that animus squarely with USTA.

9

In this context, to read Title VII as requiring Felder to plead the full scope of factors that would have created a joint employer-employee relationship with both USTA and AJ Security if Felder had been permitted to work seems strange. The majority recognizes, correctly, that nearly all of the factors it would typically consider in determining the existence of a joint employer relationship are inapplicable here, because they "presume an existing relationship between two parties . . . [and] the USTA allegedly denied Felder his credentials *before* he could start work as a temporary security guard." Op. at 20 (emphasis in original). However, instead of acknowledging the necessity of a corresponding change in the calculus of relevant factors, the majority concludes that in the context of a failure to hire claim, plaintiffs like Felder must show that "the USTA [would] have been Felder's joint employer *had* Felder worked at the U.S. Open." Op. at 22-23 (emphasis in original).

As a practical matter, that obligation would be extremely difficult for most applicants to meet.[2] A rejected applicant would be hard put to collect, in advance

---

[2] The Court acknowledges that, as an applicant who had prior experience working security for USTA through a former contractor, Felder might have such information, and remands to permit him to amend his complaint to attempt to satisfy the burden that the Court imposes on him. Op. at 31-32. An applicant without such experience would have a much harder time developing such facts. In any event, I believe that as a matter of law a

of discovery, evidence about who would have controlled which decisions in a hypothetical relationship that was never allowed to exist. But putting that practical objection aside, the more fundamental flaw in the majority's approach is that it chooses to rely on factors that it acknowledges are *irrelevant* to the sole decision that was made, in order to determine whether that decision was prohibited by Title VII.

That a failure-to-hire claim must be treated differently from other types of adverse employment actions *precisely* because it arises prior to the establishment of an employer-employee relationship is not a novel concept. As one district court in this Circuit has observed, a "failure-to-hire claim is distinguishable from other employment discrimination claims in that it necessarily applies in most circumstances to non-employees seeking employment positions rather than current employees." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018) (quoting *Suri v. Foxx*, 69 F.Supp.3d 467, 475–76 (D.N.J. 2014)) (emphasis added). The majority's insistence that the existence of an employer-employee relationship is a necessary element of every claim under Title VII

---

plaintiff asserting a claim of discriminatory refusal to hire should not bear such a burden of pleading or proof in the first place.

neglects to recognize a key distinction between failure-to-hire claims and other types of discrimination claims, and relies all too heavily on a body of case law developed solely in the latter context.

The majority's approach makes sense in the context of a conditions-of-employment case, in which an already-hired employee complains that he has been subjected to discriminatory terms or conditions of employment. In that setting, a court looks to the details of the tripartite relationship between the worker, his nominal employer, and the entity to which he provides services in order to figure out whether decisions ostensibly made by the subcontracting agency should be attributed to the ultimate recipient of the services. That test is appropriately difficult to meet, because it seeks to sort out what are often joint responsibilities for supervision and management of staff.

But the majority's approach makes little sense in the context of a failure-to-hire claim. Here, the relevant question in determining Title VII liability is *who is responsible for the refusal to hire*. That is not because the power to hire and fire is the dispositive factor in determining joint employer status as a general matter, but because it is the most – indeed the only – relevant factor in a failure-to-hire case. The allegations of responsibility in such a case are, as a practical matter, simple

and direct. Nor is there any policy reason to protect an employer such as USTA from the consequences of decisions for which it, on the facts alleged, is solely responsible. If USTA hired its own security guards, the Civil Rights Act would not permit it to maintain a security staff that was all-white, all-male, all-straight or all-gentile, or to refuse employment on its premises to "troublemakers" who complained of discriminatory treatment of black, female, gay, or Jewish employees. The majority finds it significant that USTA does not insist that AJ Security *fire* employees of protected groups, or not to assign them to work for other entities to whom it contracts to provide security guards. Op. at 24. But Title VII does not impose liability only on employers who seek to require *other* companies to maintain exclusionary workforces; it seeks to prevent employers from maintaining exclusionary workforces *themselves*. There is no reason to shield a company that accomplishes its biased preference not to allow disfavored groups to work for it in various capacities indirectly, by nominally delegating the hiring of those employees to another agency, and then refusing to accept those that the agency hires to work for it for discriminatory reasons.[3]

---

[3] Such indirect discriminatory practices unquestionably harm both minority workers and subcontracting agencies. Whether or not Felder himself falls into this category, it would hardly be unusual for an agency in AJ Security's position to supplement its normal workforce when supplying a significant number of workers for a temporary assignment

If it makes economic sense for USTA, which needs a large security staff only for a limited time period during which it sponsors an event catering to thousands of spectators, to delegate the hiring and supervision of those guards to a specialized contractor, there are legitimate reasons not to require it to police the hiring decisions of that subcontractor or to hold it liable for discriminatory actions taken by that contractor. But there is no plausible reason to allow an employer such as USTA to indulge its own biased preferences by purporting to outsource the hiring of security guards at its events to a contractor, while retaining the absolute and unilateral power to turn away any guards sent by the subcontractor based on prohibited grounds of discrimination or retaliation. To the extent that the goal of the joint employer doctrine is to "prevent" employers from "evading liability by hiding behind another entity, a staffing entity," *Butler*, 793 F.3d at 410, then USTA should not be able to have it both ways. If it is not to be held responsible

---

such as the US Open to recruit candidates in search of temporary, seasonal or supplemental employment, who would not have a regular position with the agency at the end of the event, or for applicants to answer advertisements for such a position because they seek a temporary assignment at such a prestigious and perhaps enjoyable event. Nor can it be questioned that contracting employers who accept only favored categories of help from subcontractors shrink the opportunities available to disfavored groups, as well as putting their subcontractors into a legally compromised position of having to discriminate among its own employees and applicants at the behest of those with whom they do business.

14

for AJ Security's employment decisions, those decisions must be those of the contractor. Employers cannot be permitted to replace a sign that says "No Irish need apply to work here" with one that says "No Irish will be given credentials to work here if they are hired by our security contractor and assigned to work at our premises."

The majority's conclusion here holds, in so many words, that an employer is free, as a matter of law, to decline to accept a subcontractor's assignment of an employee to work for the contracting company on the basis of race, sex, or other prohibited categories, without liability under Title VII. While the joint employer doctrine sensibly protects companies from the discriminatory employment practices of its subcontractors where the company is insufficiently involved with the conditions of employment to be reasonably held responsible for the subcontractor's acts, it makes little sense to adopt a rule that permits an employer to require its subcontractors to violate Title VII by sending it only white security guards, or non-Jewish bookkeepers, or female office temps, thus putting the subcontractor to the choice of losing the contract or violating Title VII itself by classifying its employees on the basis of race in ways that will adversely affect their employment opportunities.

15

Nothing in the text of the statute, or prior precedents of the Supreme Court or of this Court requires that conclusion.[4] The Court's decision today represents a policy choice to extend rules that may be appropriate to protect the right of employers to contract out responsibility for compliance with various labor laws to situations in which the employer has *not* contracted out the all-important hiring decision, but instead retains its own power to choose its workers on discriminatory grounds. That choice is incompatible with the rights Title VII was designed to protect.

I therefore respectfully dissent.

---

[4] The principal cases relied on by the majority, *Knitter v. Corvios Mil. Living*, 758 F.3d 1214 (10th Cir. 2014), and *Redd v. Summers*, 232 F.3d 933 (D.C. Cir. 2000), involve allegations of discriminatory or retaliatory *termination*. While I find those cases questionable for the same reasons discussed in this dissent, I note that termination cases, as opposed to hiring cases, do involve some of the same difficulties as terms-and-conditions cases. Termination cases and terms-and-conditions cases arise in the context of an existing employment relationship, and often grow out of the same kinds of complicated workplace dynamics. Terminations usually involve claims that the employee was discharged for workplace misconduct rather than discriminatory or retaliatory animus, and thus implicate the kinds of complex interactions in which decisions that may nominally be made by the subcontracting agency are the product of complaints by the ultimate employer and responses by the agency. The question of who is responsible for supervising the employee's performance and the other factors relevant to the joint employer doctrine may therefore well be relevant in that context. But as this case illustrates, the fact question raised in failure-to-hire cases will generally be cleaner.